JONES, Justice.
On a charge of murdering her husband, appellant was convicted and given a life sentence in the Circuit Court of Bolivar County. We affirm.
There are only two assignments of error, to-wit:
(1) The admission of photographs of the deceased on the bed on which he died, together with surrounding articles.
(2) The failure to grant appellant a peremptory instruction under the “Weath-ersby” rule; Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933).
As to the photographs, it is true that this Court has held they should be practically instructive as evidence. Here the procedure approved in Le Barron v. State, 107 Miss. 663, 65 So. 648 (1914) was followed. That is, a preliminary hearing in the absence of the jury was held, and the judge found the pictures admissible, after which they were admitted into evidence.
Picture Number 1 showed the deceased, fallen directly backwards on bed with feet flat on the floor. It was claimed he was standing when shot and the proof showed he was shot in the right side of the neck, not in the front. Each picture was shown to have some evidentiary value, including, but not confined to, the emaciated condition of the deceased. The judge did not abuse his discretion.
The “Weathersby” rule [Weathersby v. State, 165 Miss. 207, 147 So. 481. (1933)] is briefly stated:
It has been for some time the established rule in this state that where the defendant or the defendant’s witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge. (165 Miss. at 209, 147 So. at 482).
The sheriff was the first witness for the state. He was called and went to appellant’s home. The deceased was lying on the bed, a shotgun wound in his neck clearly shown by the pictures. He examined two shotguns by the bed — one had an empty shell, recently fired.
When asked if the defendant made any statements to him, the sheriff replied: “Yes, sir, she made a statement to me; *460 she said that she taken the gun away from him and shot him, the shot killed him.” This was a spontaneous voluntary statement, and would contradict her defense of “accident.”
It was shown by a next door neighbor, Allen Brown, that he visited in the home; that a number of times appellant would call him to go there. When he would go there, the deceased would be lying down; that the deceased was a weak, sick, man, and that several times he helped her pull him up from the floor. On this occasion, when she called him, he met her halfway between her house and his, and she told him to go in there and look at him (the deceased) because, “I done kilt him,” and she repeated this statement to him.
A deputy sheriff made test firings with the shotgun loaded with a light load, and a heavy load of number four shot, and the hole made at a distance of ten feet from the muzzle of the gun matched the hole in the right side of the decedent’s neck. Appellant made the statement to Dorothy Brown, no relative of the parties, that after the shooting, appellant told her, “ * * * I killed Brother Brown; go call the police.”
One Bilbo Moore, another neighbor, testified that he saw appellant the afternoon of the killing when she came over to his house just across the street from her house, and “sort of around the corner.” This was about first dark and he said that she asked him for a drink of whiskey. When he told her that he had none, she replied that when Roosevelt comes, she would get them one. (Roosevelt was dead).
After a few minutes of laughing and talking, she left, secured the whiskey, came back to his house, and told him to take his drink. She had a pint of whiskey from which he poured about half for himself. He did not remember whether she took a drink there or took her whiskey home, but said that she finally told him, “You ole son of a bitch, I am going to kill you, and I’m going to kill Brer Brown, too.” About thirty minutes later, she came back by there and said, “I done killed Brer Brown, better go see about him.” He did not go.
Another witness testified that after the killing, he heard her say that she had killed Brer Brown, and that “she had killed the son of a bitch.”
The appellant in her testimony denied being at Bilbo Moore’s and drinking any whiskey. In rebuttal, two sheriff’s deputies testified that when they were at appellant’s house, they smelled whiskey on her breath and that she was “high.” While Bilbo Moore’s character was impeached, the weight of his testimony was for the jury.
Dr. John Milam, a practicing licensed physician, at Cleveland, Mississippi, had treated the deceased prior to his death. The deceased had had a stroke probably a year to two years before his death, and the doctor had been treating him for that condition off and on, averaging about once every two weeks to a month. Prior to that time, he treated him for high blood pressure and a kidney infection, and things of that type. The stroke decreased his motor capacity and his ability to speak clearly and distinctly. He never regained the capability to speak to the point where the doctor could understand him. His motor activities, that is, using himself, his arms, legs, and all that, were considerably diminished although he was still able to walk about and raise his arms. He used a cane in walking. He testified that when the jugular vein and artery were severed, the blood would spurt out with each beat of the heart and that from the artery, blood would go two and a half to three feet right along. This accorded with the pictures. When asked, if in his opinion the decedent could have defended himself in any kind of struggle, the doctor answered :
Not to any great extent in my opinion. In a very meager manner, I would say. Let me, to try to show you what I’m *461 talking about, when Tom would come to see us, and when he would go to pay his bill in leaving at the front desk, he would have a considerable trouble getting into his hip pocket and getting his wallet out, and sometimes to the point that he would have to have somebody to help him in this particular endeavor. And, in my opinion, he did not have a great deal of muscular, or motor, capacity at that time. If I were to put it in percentage of his usual, which he had had say ten years ago, he probably would have had only perhaps twenty-five to thirty per cent of his original capacity, say five or ten years prior.
The doctor was asked whether at the last time he saw him, if he was not armed in some way or if he had had a gun and the gun had been taken from him, would he have been a serious threat to anyone as to great bodily harm. The doctor answered, “In my opinion, no. In my opinion, no, only if that person had of been a real small child or a baby, well, of course, that would be different, but otherwise, no.”
The doctor did testify in his opinion Brown had the physical ability to stand and hold the shotgun and to cock it.
The appellant testified that she was fifty-four years of age, and that she and her husband married in 1960 at which time, he was sick. She said that afternoon or evening, her husband was mad because supper was delayed and he undressed and got in bed. When she stooped to get his cuspidor from under the bed, he grabbed her by the neck and she pulled loose; she again stooped and he grabbed her again, and she said she asked him if he were out of his mind. He said, “yes,” and then he told her he was going to get up and blow her brains out. She testified:
So, I walked on off, started in the kitchen, and then when I looked around, he had rech (sic) over between the bed and the table and got the shotgun. So, I run into him and grabbed him. So, that’s why we was tussling with the gun — he—when the gun went off, he fell on the bed, and I fell back in the kitchen door.
She placed the distance about ten feet at the time the gun discharged. She denied the weakness of her husband and testified that the stroke merely cut his speech down a little bit, and she denied other statements of the doctor. She testified that he was just about as good a man physically as the day they married. She further testified that he stood up and pointed the shotgun at her; that she ran and grabbed the gun; that it went off and shot him. She further said that she did not take, the gun until it went off, and, yet, there was no powder burns on his neck. Also, no bruises were mentioned or shown on her neck where he was said to have grabbed her.
She again said that the gun went off before she took it and that they were pulling and tussling over it.
The voluntary statement to the sheriff did not coincide with her defense of accident but was contradictory thereto. There were also in evidence her threats to kill him, her report that she had killed him, and her cursing him after she killed him. Her two statements on the witness stand that she had pulled the gun away from him and that it was about ten steps from him when it went off and her other statement that it went off while they were tussling over it and no powder burns on the deceased, contradicted her defense of accident, and, together with the evidence furnished by the pictures and the other evidence, takes this case out of the Weath-ersby Rule, and it is, therefore, affirmed. Robinson v. State, 228 So.2d 373 (Miss.1969).
Affirmed.
ETHRIDGE, C. J., and RODGERS, BRADY and INZER, JJ., concur.