432 So.2d 427 (1983)
Alvin HILL,
v.
STATE of Mississippi.
No. 53795.
Supreme Court of Mississippi.
May 4, 1983.
Rehearing Denied May 25, 1983.
*429 Suggs & Anderson, Alvin Suggs, Wallace Anderson, Olive Branch, for appellant.
Bill Allain, Atty. Gen. by Billy L. Gore, Asst. Atty. Gen., Jackson, for appellee.
En Banc.
HAWKINS, Justice, for the Court on Parts I, II, and III; BROOM, Presiding Justice, for the Court on Part IV.
Alvin Hill appeals from his conviction of capital murder and sentence of death in the Circuit Court of DeSoto County. We affirm.
The two most serious questions on this appeal concern the admission of the murder weapon into evidence as being violative of the "fruit of the poisonous tree" doctrine and the refusal of the trial judge to grant instructions requested by the defense in the sentencing phase. The former is discussed in Part II of this opinion, the latter in Part IV.
The remaining assignments of error are addressed in Part III.

*430 I.

FACTS
On Friday, August 17, 1979, at approximately 6:30 p.m., reserve deputy sheriffs Donald Sutton and Mike Madden were patrolling Stateline Road in DeSoto County. They observed a disturbance at a car parked in a driveway and stopped to investigate. The problem was nothing more than a family quarrel, but while they were quieting the disturbance, they detected a foul odor. They walked towards the woods north of the road, from whence the odor came, and just inside the woods found the decomposed body of Robert Lee Watkins, whose truck had been hijacked. Watkins had been robbed and murdered on July 12, 1979.
At the time of his death Watkins was employed as a truck driver for American Freight Lines Trucking Company in Memphis.
Upon seeing the decomposed body, other law enforcement officers were summoned, and an investigation continued well into the night. Beside the remains Watkins' wallet was found, containing his Tennessee driver's license, his social security card, and a credit card bearing his name. The remains were identified by experts, and there is no question but that the human bones and remnants of rotting flesh the officers found were what was left of Watkins' corpse.
On July 16, 1979, after the Watkins murder but prior to discovery of Watkins' body, in Tunica County, Alvin Hill and one Sammy Lee Hampton hijacked and robbed a truck driver employed by the Nat Buring Packing Company. Hill was arrested and taken into custody for this crime by Tunica County Sheriff Hugh Monteith on July 20. The record does not reflect precisely when Hampton was arrested, but no doubt his arrest also took place on or about July 20.
FBI Agent Bobby G. Shanks questioned Hill in a Memphis police station on July 19 and 20 about the hijacking of the American Freight Lines truck. He testified he questioned Hill again July 25 in the DeSoto County jail. Present at these interrogations, in addition to Agent Shanks and Hill, were A.D. Gatewood of the Mississippi Highway Safety Patrol and Sheriff Monteith. According to Agent Shanks, he informed Hill on July 25 that Hampton had told him the previous day that Hill was involved in the hijacking of the American Freight Lines truck and the disappearance of the driver. According to Shanks, when he made this statement to Hill, he replied, "Sammy will get his."[1]
Ricky Wayne Ward was chief investigator for the DeSoto County sheriff's office on August 17, 1979, and some time that night informed Hill the body of Watkins had been found.
Ward next questioned Hill on the morning of August 18 in the Tunica County jail.
*431 Shortly after 5:00 o'clock that afternoon, in the presence of Sheriff Monteith, DeSoto County Sheriff Denver Sowell, deputy Bobby Gene Biffle, and Ward, Hill confessed the robbery and murder of Watkins. The confession was made in the sheriff's office in Tunica County.
According to Hill's confession, one Gregory Tucker and another black male whose name he did not know participated in the hijacking and robbery, but Hill stated he was the person who shot Watkins. He stated Watkins was on his knees at the time, and the first shot was into the back of Watkins' head. He believed he shot three times. (R. 175). When asked what he did with the murder weapon, Hill stated it was thrown into the Coldwater River from a highway bridge south of Hernando.
Two aspects of the confession need now be noted. First, it was later ruled an involuntary confession on a pre-trial motion to suppress, and was therefore inadmissible at trial. Second, Hill's statement in the confession that the gun was thrown into the river was false. Later in the evening of Saturday, August 18, around 8:00 to 8:30, Ward returned to Hill's jail cell, and Hill told him "Mr. Carter" of Memphis had the gun.[2]
On Sunday, August 19, Sheriff Monteith telephoned the Memphis Police Department and informed officer Bobby S. Rust that a black male named Robert Carter had the pistol, and that he worked for either a Goodyear or B.F. Goodrich store on Union Avenue.
On Monday morning, August 20, officer Rust and Sergeant Priddy of the Memphis Police Department questioned Carter at a B.F. Goodrich store on Union Avenue; Carter told them he had loaned his pistol to a black male he knew only as "Rusty" (and who in fact was Hill). Carter took the officers to his apartment in Memphis and delivered the pistol to them. Carter was not implicated in either of Hill's robberies, and never was charged with any offense. He testified as a witness for the state at Hill's trial.
After recovering the weapon, the Memphis Police Department delivered it to Ward.
On October 5, 1979, the grand jury of DeSoto County indicted Hill, Tucker, and one Laverne Milam for capital murder of Watkins, in the commission of the crime of robbery, in violation of section 97-3-19(2)(e) of the Mississippi Code. Milam did not testify and the record does not reveal anything about him other than the fact that he was arrested in Flagstaff, Arizona, and returned to Memphis by the Memphis Police Department. Tucker pleaded guilty to manslaughter and testified as a witness for the state.
The circuit judge conducted a hearing on November 4, 1980, on the motion to suppress the confession, and ruled the confession had been given as a result of inducements by Ward, and was therefore inadmissible.
A bifurcated trial of Hill for capital murder was begun November 17, 1980, and concluded November 21.
Clarity of this opinion does not require a detail of the trial evidence. When necessary or appropriate, we will discuss relevant portions of the record under the various assignments of error.
One part of the trial proceedings, however, does deserve our scrutiny at this time. This involves the admission into evidence of the murder weapon, the pistol recovered from Carter.
When Sheriff Monteith was called as a witness by the state, the record reveals the following testimony relative to the source of his information about the murder weapon:

*432 Q. Sheriff Monteith, in the course of your investigation, did you have occasion to interview Sammy Hampton?
A. I did.
Q. As a result of those interviews, did you at anytime inform officers of the Memphis Police Department where a possible gun could be found?
A. I did.
* * * * * *
Q. Do you recall, Sheriff Monteith, who you gave that information to?
A. I gave it to a Sgt. Priddy of Major Crimes in Memphis, Tennessee. Sgt. Priddy.
Q. As a result of that information being given to Sgt. Priddy, do you know whether or not any weapon was recovered?
A. No, sir, I do not know whether  I passed the information on, and I do not know the results of that  what the outcome of that was.
(R. 818-819) (emphasis added).
The above testimony of Sheriff Monteith was admitted in open court without objection by defense counsel.
Later in the trial, the trial judge conducted a hearing in chambers prior to the introduction of the murder weapon before the jury. During that hearing, officer Rust related the receipt of the information about the pistol from Sheriff Monteith on Sunday, August 19, as above noted; that Sheriff Monteith did not give the source of the information; and that Rust did not know from whom Sheriff Monteith got his information. Rust then testified to obtaining a .357 Magnum (Ruger) revolver pistol from Carter the next day, also as above noted.
Officer J.E. Anderson and Sergeant R.E. Priddy of the Memphis Police Department corroborated the testimony of Rust as to the recovery of the weapon from Carter. Priddy further testified that Hampton had been previously arrested for the Tunica County robbery and that Hampton had supplied no information about the American Freight Lines hijacking. Priddy also testified that in their questioning of Milam, he had no knowledge of where the pistol came from.
Ward then testified he had received the pistol from the Memphis Police Department. Ward was not asked on direct examination and did not testify whether he had received any information about this gun from Hill.
On cross-examination of Ward, the following appears in the record:
Q. Rick, you did not participate in the recovery of this weapon?
A. No, I was contacted by the Memphis Police Department that they had custody of the weapon.
* * * * * *
Q. Did they ever tell you how they got information in reference to the recovery of this gun, what their source of information was?
A. No, sir.
* * * * * *
Q. Rick, what information did you receive on this gun?
A. Rust or Priddy one called me and told me that they had picked somebody up who had the gun that was used in the murder, and that the person had told them that they had loaned Hill this gun, and they wanted to know if we needed it in our case. I told them yes, and I asked them to return it  you know, give it to us for they (sic) trial, and they said yes. So, I went up and they took me over to the property room and assigned it over to me.
(R. 925-927).
Following the above testimony, the trial judge made a ruling. In so doing, he also had before him a transcript of the November 4 pre-trial hearing at which time he suppressed the confession. The circuit judge noted that in Hill's confession he stated the gun was thrown into the Coldwater River. The circuit judge then made the following statement:

*433 The Defendant takes the very strong stand that this is  could only be or is in fact fruits of the poisonous tree, that the information could only have been provided to law enforcement officers from Defendant Hill. The testimony before the Court, however, and what I must consider and bound thereby .. .
At this point in his ruling the circuit judge was interrupted by defense counsel, who requested that the court hear Hill for limited purposes only as to the admissibility of the weapon. (R. 929-930).
Pertinent portions of Hill's testimony in chambers are as follows:
Q. Alvin, you testified earlier, and the Court is acquainted with you. Would you tell the Court when and whom you told about the whereabouts of this gun in question?
A. I told Mr. Ward about it.
Q. When did you tell Mr. Ward about it?
A. Well, it was the same day I gave my confession, but it was about 8:00 or 8:30 that night. He came back  I told him I throwed it in the Coldwater River and he came back and said he couldn't find it. He was saying that he wanted me to help him, to tell him where it was. So, I told him Mr. Carter had it.
Q. Was Sheriff Monteith at the jail at that time?
A. No, sir, he was gone home.
Q. Alvin, did you at anytime indicate the whereabouts or who owned this pistol to Sammy Hampton?
A. No, sir.
Q. Did you tell Sheriff Monteith?
A. No, sir.
Q. The only officer you told about it was Rick Ward.
A. Yes, sir, that's right.
(R. 930-931).
Cross-examination of Hill elicited the following:
Q. Mr. Hill, have you discussed what we call the fruit of the poisonous tree doctrine with your lawyers?
A. No, sir.
Q. Have they not told you that any evidence that is recovered as a result of suppressed confessions would be inadmissible?
A. I don't understand your words.
* * * * * *
Q. Now, did your lawyers tell you that anything else that was recovered after that confession couldn't be introduced?
A. No, sir, they haven't told me that.
Q. They haven't told you that? Did you hear Sheriff Monteith say he got the information, yesterday, from Sammy Hampton?
A. I didn't quite understand what he was saying about what gun he was talking about until now.
(R. 931-932).
Then, on re-direct:
Q. Alvin, will you explain what you mean by what gun Mr. Monteith was referring to?
A. Well, I thought yesterday Mr. Monteith was referring to the gun that was used on the meat truck.
Q. So, you're telling the Court that Sheriff Monteith could have been referring to another weapon.
A. That's what I though he was referring to.
Q. Who supplied that weapon?
A. Sammy and myself  about who told him about it?
Q. Where did  where did Sammy get the weapon and where did you get the weapon in Tunica County?
A. Well, I got it from  Sammy got it from Quincy, his next door neighbor.
Q. Who returned it?
A. Sammy.
(R. 933).
There was no rebuttal to Hill's testimony. The state did not call either Ward or Monteith, and neither did the defense. Further, Hampton did not testify on this question. From the record, this Court can only assume *434 Hampton was then in the state penitentiary.
The circuit judge then made his final ruling as to the admissibility of the murder weapon:
THE COURT: The testimony before the Court from Sheriff Monteith given at approximately 4:00 P.M. on November 18th, this being November 19th, and the Court quotes from its notes made in the testimony of Sheriff Monteith that he informed Officer Priddy of the Memphis P.D. where gun could be found after an interview with a person by the name of Hampton, and that he did not know the results of information passed on to the Memphis police officer. During this motion in Chambers, Defendant Hill was called upon to testify for the limited purposes of rebutting testimony of Sheriff Monteith and other officers who had testified primarily as to the recovery of this weapon from a Robert Carter in Memphis, Tennessee, and to the links in the chain establishing custody and control of the weapon since its recovery. The Court understood, and it is now a matter of record, from Defendant Hill that he gave information to Officer Ward about the whereabouts of this weapon out of the presence of Sheriff Monteith, which makes it apparent to the Court that the information passed on to Officer Priddy by Sheriff Monteith was developed by him from some source other than the Defendant, it being contended by Defendant that this information possibly was derived by the Sheriff from the Defendant after and subsequent to the confession which the Court has heretofore suppressed. The Court, therefore, is compelled to overrule the motion now before it in Chambers to suppress the introduction of this firearm because it was derived by statements of the Defendant subsequent to the suppressed confession. Gentlemen, I think the record is abundantly clear on that point, and I think all of you will have to agree that that's what is in the record.
(R. 933-935).
The pistol was then admitted into evidence before the jury by the same witnesses.
This involved and lengthy trial proceeded, resulting in Hill being found guilty on the guilt phase of the capital murder trial, and thereafter the same jury on the sentencing phase reached a unanimous verdict that he should suffer death.

II.

DID THE TRIAL COURT ERR IN ADMITTING INTO EVIDENCE A GUN, OVER APPELLANT'S TIMELY OBJECTION, THE SAME BEING THE "FRUIT OF THE POISONOUS TREE"?
This Court has upon numerous occasions dealt with the admissibility of evidence procured as a direct result of the violation of a constitutionally protected right, under both the United States and Mississippi Constitutions. It is well settled and requires no citation of authority that evidence obtained as a result of either a warrantless search or an illegal search warrant is inadmissible.[3] Likewise, evidence obtained as a result of an illegal arrest is inadmissible. See Pollard v. State, 233 So.2d 792 (Miss. 1970); and Terry v. State, 252 Miss. 479, 173 So.2d 889 (1965).
In Dover v. State, 227 So.2d 296 (Miss. 1969), the Sheriff of Quitman County obtained a confession from the accused on a Saturday. On the Monday following the sheriff again questioned the accused and learned the whereabouts of the victim's shirt. Upon appeal, we held the confession was involuntary and therefore inadmissible. *435 We also held that admission of the shirt into evidence was error, since it was a result of the illegally obtained confession. We stated:
We are of the opinion that the evidence appertaining to the shirt falls within the exception noted above and that if it is to be admitted in evidence, it must be identified by evidence other than the involuntary confession or admissions subsequent thereto. The admission of a mentally retarded person, in our opinion, is governed by the same evidentiary rules as those applying to the confession. We conclude that the trial court committed reversible error in admitting the confession, as well as the admission concerning the shirt, into evidence.
Id. at 301.
The question before us is not the validity of this well recognized principle, but whether or not it was properly applied by the trial judge. On this point we have no Mississippi case, and must resort to cases in the United States courts which are also determinative.
On the record before us, there is no contradiction that Hill told Ward he got the gun from Carter, and this followed a confession which the trial judge ruled inadmissible. The record leaves a question whether the state procured the information about the gun from a totally independent source, Sammy Hampton.
Assuming the state has received information not only as a result of a violation of a constitutionally protected right, but also from a totally independent source, who has the burden of proving the information was derived from such totally independent source, and what is the degree of proof?
In Dover, supra, there was no question but that the information about the incriminating shirt came solely from the accused. In the instant case, we have two possible sources of information as to the location of the murder weapon.
In Silverthorne Lumber Company v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), the Supreme Court, speaking through Justice Holmes, expanded the rule excluding evidence illegally seized to also reach information received from such tainted evidence. However, the Court also indicated that the evidence might be admissible if gained from an independent source. The Supreme Court stated:
The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the government's own wrong cannot be used by it in the way proposed.
Id. at 392, 40 S.Ct. at 183.
In Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), the Supreme Court, speaking through Justice Frankfurter, first used the figure of speech "fruit of the poisonous tree." Nardone involved evidence obtained as a result of illegal wire-tapping. The Court stated:
The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that the wire-tapping was unlawfully employed. Once that is established  as was plainly done here  the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin.

Id. at 341, 60 S.Ct. at 268 (emphasis added).
In Nardone the Supreme Court also recognized that the claim of a connection between illegally obtained evidence and information claimed to be derived therefrom "may have become so attenuated as to dissipate the taint." Id.
In Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Court put the question in a different way:

*436 We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

Id. at 487-88, 83 S.Ct. at 417 (citation omitted) (emphasis added).
Wong Sun held that not only was evidence acquired as a direct result of a violation of a constitutionally protected right excluded; indeed, if the trail of illegal conduct led to other evidence, such other indirect evidence would also be excluded unless it was shown such other evidence came from (1) an independent source, or (2) had become so attenuated as to dissipate the taint.
The above loose and rather general pronouncements of the Supreme Court have been delineated in a multitude of state and federal court decisions. It is to the 5th Circuit Court of Appeals, however, that we must resort.[4]
The Court of Appeals for the 5th Circuit has held that once a defendant makes a showing of unconstitutional conduct by the government in securing its evidence, the burden shifts to the government to demonstrate by a preponderance of the evidence that one of the above two noted exceptions applies. See United States v. Tweel, 550 F.2d 297 (5th Cir.1977); United States v. De La Fuente, 548 F.2d 528 (5th Cir.1977); and United States v. Houltin, 525 F.2d 943 (5th Cir.1976).
We are not concerned in this case with the second noted exception, but whether the information about the location of the gun came from an independent source.
Hill testified he gave Ward information about the gun. This is uncontradicted.
On the other hand, if Hampton also gave Tunica County Sheriff Monteith information about the gun, this could very well be an independent source, and certainly "sufficiently distinguishable" from the information from Hill "to be purged of the primary taint".
Regrettably, for all concerned  including this Court  the record is incomplete.
Let us to go Wednesday afternoon, November 19, 1980, in the chambers of the circuit judge. The previous day he has heard Sheriff Monteith testify, and from that testimony (although perhaps not as clearly stated as it might have been), coupled with what the Memphis police officers testified, one could only conclude that Hampton told Sheriff Monteith about the Carter gun. Indeed, there seemed to be no question about it.
The circuit judge is then suddenly confronted with a startling second possibility. Hill had just testified that he told Ward that Carter had the gun.
At this intriguing, tantalizing moment, the well of information runs dry. While either Ward, Monteith, or Hampton  certainly two out of these three  could have cleared the air and removed all doubt in a few moments of testimony, none was called. Why?
The defense cogently argues that their hypothesis for the information concerning the location of the gun was correct. But, with the record before us, that is all it is. While we agree that the state arguably should have offered some rebuttal to Hill's testimony in chambers, it chose not to do so, and rested on the testimony of Sheriff Monteith the previous day.
Conduct of defense counsel is puzzling. They did not recall Ward or Sheriff Monteith *437 for further cross-examination. This failure might be understandable in the middle of this difficult and enormously burdensome trial. But, let us move further in the proceedings. Following trial, defense counsel made a motion for a new trial, and one of their strongest arguments was the admission of the gun into evidence. With ample time to prepare for the hearing on this motion, they did not subpoena Ward, Sheriff Monteith, or Hampton to testify, and no affidavit of any of these three was supplied the court.
On the testimony which was before the circuit judge and the record as made, no one could ever know which of these two hypotheses is correct. Argument from now until doomsday could never give the answer; from this record we are damned to an eternal suspense.
Under these circumstances we are not about to fault a beleaguered trial judge, nor can we say he abused his discretion in finding that the information about the gun came from an independent source. On the record before him at trial, and in the motion for a new trial, he had a right to believe the testimony of the officers, and we find no reversible error on this record in his having done so.[5]

III.

(a) DID THE TRIAL COURT ERR IN REMOVING A PROSPECTIVE JUROR FOR CAUSE?
A prospective juror was excused for cause after stating he could not return a verdict imposing the death penalty. He had stated there were cases in which he might consider the death penalty, but not this case. No error was committed by the circuit judge in excusing this juror for cause. See Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); Irving v. State, 361 So.2d 1360 (Miss. 1978), cert. denied, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979); and Armstrong v. State, 214 So.2d 589 (Miss. 1968), cert. denied, 395 U.S. 965, 89 S.Ct. 2109, 23 L.Ed.2d 750 (1969).

(b) DID THE CIRCUIT JUDGE ERR IN DENYING THE DEFENSE REQUEST FOR FURTHER MENTAL EXAMINATION?
Several months prior to trial, upon motion of the defense for mental evaluation, Hill was sent to the Mississippi State Hospital in Whitfield, where the medical staff rendered an opinion that Hill was competent to stand trial. The motion for his examination did not claim he lacked the mental capacity to form a criminal intent, and was therefore not guilty because of insanity; rather, the motion was predicated on whether or not he was mentally incompetent to the extent that he could not assist his counsel and prepare for trial.
Unsatisfied with the medical evaluation of the staff at Mississippi State Hospital, counsel made a motion for another examination to determine his sanity and competency to stand trial. The circuit judge overruled this motion. The circuit judge was under no obligation to locate another psychiatrist for the defense.
Moreover, if there is one thing clear from this record, Hill was competent to stand trial. Or, put another way, if he were mentally incompetent to answer questions and to fully assist his counsel, it would take an extraordinarily skilled psychiatrist to detect it.
Just prior to trial Hill was examined by a psychologist, who administered a test. Counsel did not offer this psychologist as a witness in either the guilt or sentencing phase of the trial. Nor was any evidence adduced from lay or expert witnesses either on the guilt or sentencing phase of Hill's *438 competency to stand trial or his mental ability.[6]
In the motion for a new trial counsel offered the psychologist as a witness, who was of the opinion that the test revealed Hill had emotional problems which were "relatively great"; that he was prone to make "impulsive decisions, and was unable to control those impulses"; that he was unable to "profit by experiences he had had in life"; and that he was experiencing some "schizophrenic behavior" at the time of testing. (R. 1252-1253).[7] He also stated no psychologist could make a determination based on a test. Finally, he was of the opinion that further testing and evaluation were needed.
On this record, no error was committed in overruling the motion for a new trial based on this claim.

(c) WERE PHOTOGRAPHS OF THE VICTIM'S REMAINS ADMISSIBLE?
The admission of photographs of the remains of Watkins was within the discretion of the circuit judge, and having probative value, no error was committed in offering them into evidence. See Tubbs v. State, 402 So.2d 830 (Miss. 1981); Davis v. State, 376 So.2d 1079 (Miss. 1979); Voyles v. State, 362 So.2d 1236 (Miss. 1978), cert. denied, 441 U.S. 956, 99 S.Ct. 2184, 60 L.Ed.2d 1059 (1979); Irving v. State, supra; Brown v. State, 235 So.2d 458 (Miss. 1970); Stokes v. State, 240 Miss. 453, 128 So.2d 341 (1961); and Price v. State, Miss., 54 So.2d 667, 669 (1951).

(d) DID THE TRIAL COURT ERR IN PERMITTING TESTIMONY THAT HILL ESCAPED FROM JAIL?
In August, 1979, while Hill was in the Tunica County jail, he escaped. Approximately four days later, he returned voluntarily.
The thrust of counsel's argument is that Hill had not been indicted for the capital crime, and therefore evidence of his escape from jail was incompetent. Of course, the time of indictment is immaterial but even on the question of whether Hill was charged with, or was a suspect of this robbery at the time he escaped, there are two answers to this argument: (1) It is not clear from the record whether or not at the time Hill left the Tunica County jail the authorities had questioned him about the Watkins robbery and disappearance, but it would appear that they had. FBI Agent Shanks interviewed him in July about this hijacking; and (2) Whether the authorities knew or did not know of his guilt of the Watkins robbery and slaying, Hill knew it.
Flight is admissible on the issue of guilty knowledge. See United States v. Ballard, 423 F.2d 127 (5th Cir.1970); McClendon v. State, 387 So.2d 112 (Miss. 1980); and Ransom v. State, 149 Miss. 262, 115 So. 208 (1928).
(e) Two assignments of error can be jointly discussed:
WAS REVERSIBLE ERROR COMMITTED BY THE STATE'S REVEALING THE CONVICTION OF A CODEFENDANT OF MANSLAUGHTER?
WAS REVERSIBLE ERROR COMMITTED IN THE CLOSING ARGUMENT OF THE PROSECUTING ATTORNEY TO THE JURY THAT ITS VERDICT WAS NOT THE "LAST WORD"?
The state called the codefendant Gregory Tucker as a witness. During questioning of Tucker, the record reveals the following:
Q. What have you been convicted of?
A. Assault and larceny of a person in Tennessee, and manslaughter down here.
Q. Manslaughter down here in connection with what?

*439 A. With this here case.
(R. 1013-1014).
No objection was made to either the questions or the answers. In fact, defense counsel cross-examined Tucker about the conviction, and asked him about being offered leniency. (R. 1043).
In closing argument, the prosecuting attorney made the following argument:
I knew that the attorneys would attempt to place a heavy burden on you. They would have you believe that you're voting to kill the Defendant and that he's going to be taken outdoors here in ten minutes and hung. That's not so, and they know that's not so, and that's unfair. That's totally unfair. They know your word is not the last word. They know that.

(R. 1190-1191) (emphasis added).
Again, there was no objection by defense counsel to this argument.
As to the state's questioning of Tucker about his conviction of manslaughter, this constituted error. See Buckley v. State, 223 So.2d 524 (Miss. 1969). The error was not as egregious as it would have been had Tucker been a witness for the defense, and the state had brought it out on cross-examination. See Warren v. State, 407 So.2d 100 (Miss. 1981); and Henderson v. State, 403 So.2d 139 (Miss. 1981). The state's questioning of Tucker, a state witness, about his conviction of manslaughter was not altogether a one way street benefitting the state. This information enabled the jury to see that a radically different treatment had been extended by the state to Tucker than that proposed for Hill.
The defense sought mileage out of this concession in cross-examination.
In view of the fact that no objection was made, that Tucker was cross-examined about his plea and conviction, and the defense at least three times in closing argument compared the treatment and punishment of Tucker as opposed to that being sought for Hill (R. 1075-1076), defense counsel's complaint at this stage appears directed towards a trial strategy in which they were participants. What this amounts to is a trial strategy counsel aided and abetted, and now seek to criticize.
Moreover, counsel did not even see fit to assign this error in their motion for a new trial. If defense counsel did consider that their client was done an injustice in this respect, we cannot understand their failure to mention it in their motion for a new trial.
The argument made by the prosecuting attorney to the jury that their verdict was not the "last word" was clearly erroneous and would ordinarily be considered highly prejudicial.
In the usual case the jury merely determines guilt or innocence, and the circuit judge determines the sentence. In a capital murder case the jury also determines the sentence.
Any argument by the state which distorts or minimizes this solemn obligation and responsibility of the jury is serious error. Every attorney knows the jury verdict is indeed the last word on a factual dispute. Neither the circuit judge nor this Court is authorized to set aside a jury verdict on conflicting evidence, or a disputed factual issue. Moreover, in a death penalty case a jury should never be given false comfort that any decision they make will, or can be, corrected.
In Howell v. State, 411 So.2d 772 (Miss. 1982), which was not a death penalty case, we condemned a "last word" argument.
A prosecutor making this sort of argument is asking for a mistrial.
In this case, however, there was no objection made to this argument. We have consistently held that contemporaneous objection must be made to improper argument by the state, and unless such objection is made, any claimed error for such improper argument will not be considered on appeal. See Coleman v. State, 378 So.2d 640 (Miss. 1979); Thomas v. State, 358 So.2d 1311 (Miss. 1978); Griffin v. State, 292 So.2d 159 (Miss. 1974); Myers v. State, 268 So.2d 353 (Miss. 1972); Peterson v. State, 242 So.2d 420 (Miss. 1970); Ford v. State, 227 So.2d *440 454 (Miss. 1969); Showers v. State, 227 So.2d 452 (Miss. 1969); and Coburn v. State, 250 Miss. 684, 168 So.2d 123 (1964). It need also be noted that this holding has applied to death penalty cases, as well as other criminal and civil cases.
There is even further foundation for application of this well settled rule in such a case as this, where, not only was there no objection made at trial, but even in the motion for a new trial counsel still did not consider this argument as error. The motion for a new trial was filed December 12, 1980, over two weeks after the trial was concluded, and a hearing was held on this motion January 6, 1981. The record reveals Hill was represented by alert, avid, and thorough defense counsel. We can only conclude counsel did not consider this argument prejudicial, and Hill is bound thereby.
For these reasons, we will not consider either of these two assignments of error on this appeal.

(f) WAS ERROR COMMITTED IN THE INTRODUCTION OF A COMPUTER PRINT-OUT OF A SHIPMENT OF GOODS?
Wayne Hopper was shipping manager of the J.I. Case Company's Memphis branch office. He testified Franz Tractor Company of Bradenton, Florida, was one of their dealers. He was handed a box containing a carburetor, numbered A39568, and testified it was a part of a shipment being returned by the Franz Tractor Company. This shipment was on the American Freight Lines truck hijacked and robbed July 12, 1979, and was not received by J.I. Case Company.
Following admission of the above testimony without objection, Hopper was handed a computer print-out of a list of parts being returned by Franz Tractor Company to J.I. Case Company at its Memphis address, on which was listed a carburetor of the same number as the carburetor offered into evidence. The carburetor above noted had been found in Hill's apartment. Hopper testified the computer print-out listed the carburetor and the computer print-out was admitted into evidence with objection.
Following cross-examination counsel objected to the admission of the computer print-out, and cited King v. State ex rel. Murdock Acceptance Corp., 222 So.2d 393 (Miss. 1969). The trial judge overruled the objection.
The trial judge committed no error in overruling the objection, even if it had been timely made. Although Hopper had nothing to do with its preparation, the computer print-out was part of business records with which Hopper came in daily contact and was familiar with, and upon which he and his company relied. His testimony was sufficient for a prima facie showing of accuracy, and there being no contradictory proof offered, it was competent evidence. The weight and credibility of this evidence was for the jury. Id.

(g) WAS REVERSIBLE ERROR COMMITTED IN REFUSING INSTRUCTIONS AUTHORIZING CONVICTIONS OR LESSER OFFENSES?
Instructions D-9 and D-10 would have authorized the jury to convict Hill of murder or manslaughter. Instruction D-8-A gives the form of verdict for such lesser included offenses.
The circuit judge refused these instructions. No error was committed by the trial judge's refusal to grant these instructions.
The testimony of Gregory Tucker made out a case of a planned and pre-conceived robbery by Hill, Milam, and himself, in which Hill was leader and chief actor.
After hijacking the truck, Hill marched Watkins off into the edge of the woods where his body was later found, and shot him in the back of the head. Tucker heard several shots. As Hill was taking Watkins from the truck to the woods, Tucker heard Watkins begging for his life.
Counsel now argues the robbery took place before the murder. Of course, the record reveals the murder took place during the execution of the robbery. Furthermore, as we stated in Pickle v. State, 345 So.2d 623, (Miss. 1977):
If the crime of capital murder could not be sustained unless the homicide occurred during the actual attack upon a *441 victim or during the actual burglary, kidnapping, arson or robbery, such could be an inducement for an assailant to kill his victim after the commission of the first crime in order to silence her/him as a witness. The rules stated in the foregoing cases is the more reasonable, and we hold that where the two crimes are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained
Id. at 626-27.
We find no merit in this assignment of error.

(h) DID THE CIRCUIT JUDGE ERR IN OVERRULING HILL'S MOTION FOR A DIRECTED VERDICT, AND A MOTION FOR A NEW TRIAL?
The testimony of Tucker, corroborated by law enforcement officers finding the carburetor in Hill's apartment, Hill's renting of the U-Haul truck which was used in the robbery and returned by him the next day, and the testimony of the law enforcement officers and expert witnesses that the body found in the woods was that of Watkins, lead us to conclude this assignment of error has no merit whatever.

(i) WAS ERROR COMMITTED IN ALLOWING INTO EVIDENCE DURING THE SENTENCING PHASE OF THE TRIAL TESTIMONY AND EVIDENCE PREVIOUSLY INTRODUCED IN THE GUILT PHASE?
During the sentencing phase of the trial the state requested, and was permitted by the trial court, to have the jury consider all previous testimony and evidence adduced on the guilt phase. The trial judge permitted this, and no error was committed in doing so. See In re Jordan, 390 So.2d 584, 585 (Miss. 1980); Irving v. State, supra, at 1367 n. 1; and Jackson v. State, 337 So.2d 1242, 1256 (Miss. 1976).
Again, this is a point which counsel for the first time argues on appeal.

IV.
BROOM, Presiding Justice, for the Court:
Argument of appellant is that reversible error was made by the trial court when it failed to grant the following sentencing instruction requested by the defense:
Instruction D-2:
Ladies and gentlemen of the jury, I charge you that you need not find any mitigating circumstance in order to return a sentence of life imprisonment. A life sentence may be returned regardless of the evidence.
The appellant contends that this refusal had the effect of denying the jury the right to sentence him according to their feelings of mercy. He maintains that the jury was left with the impression that they were bound to return a verdict that the appellant should suffer the death penalty if they found that aggravating circumstances outweighed the mitigating circumstances from the evidence presented. According to him, this would be tantamount to a mandatory application of the death penalty and contrary to the mandate of individualized consideration handed down by the United States Supreme Court in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
We do not agree that the jury in the case in question was under any impression that they had no choice but to impose the death penalty. Their verdict was as follows:
We, the Jury, unanimously find that the aggravating circumstances ... outweigh the mitigating circumstances and are sufficient to impose the death penalty, and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances ...
In Jordan v. State, 365 So.2d 1198 (Miss. 1978), the defense was denied an instruction very similar to the one in question here:
The Court instructs the jury that you do not have to find any mitigating circumstances in order to return a verdict that the accused should be sentenced to life in prison.
Id. at 1205.
We considered the requested instruction along with the other instructions which were granted and stated:

*442 Here, Jordan relies on Jackson v. State, which held:
The jury shall not be required to make a special finding of any mitigating circumstances in order to return a verdict that the accused should be sentenced to life in prison. However, before the jury may return a verdict that the defendant should suffer the penalty of death, they must unanimously find in writing that after weighing the mitigating circumstances and the aggravating circumstances one against the other that the mitigating circumstances do not outweigh he aggravating circumstances and that the defendant should suffer the penalty of death. (Emphasis added).
We note the great difference in not requiring the jury to find any mitigating circumstances in order to return a verdict of life imprisonment as opposed to not requiring the jury to "make a special finding of any mitigating circumstance in order to return a verdict that the accused should be sentenced to life in prison." (337 So.2d at 1256). If there were any merit to Jordan's contention here, and if instruction D-13 be considered as correct, the jury resolved the issue by finding:
We unanimously find that after weighing the mitigating circumstances and the aggravating circumstances, one against the other, that the mitigating circumstances do not outweigh the aggravating circumstances, and that the Defendant should suffer the penalty of Death.
Upon these facts, there is no reversible error in the refusal to grant instruction D-13.
Id. at 1205.
The jury in this case, just as the jury in Jordan, unanimously found that the aggravating circumstances outweighed the mitigating circumstances and that the death penalty should be imposed. Their verdict is set out in language which shows that they had come to the conclusion that the aggravating circumstances justified the death penalty's imposition and not that they had no other choice but to impose it. Based upon our holding in Jordan, we find no reversible error in the lower court's refusal to grant instruction D-2.
Hill also complains of the refusal of the circuit judge to grant sentencing instruction D-5 which instructed the jury that unless they believed beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances, they should return a verdict of life imprisonment.
The answer to this contention is that the sentencing statutes, Mississippi Code Annotated §§ 99-19-101 and 99-19-103 (Supp. 1981), make no such requirement in the sentencing phase of the trial. This very contention was made in Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982), and rejected by the Court of Appeals for the Fifth Circuit in the following language:
Ninth, Gray argues that the jury should be required to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances before it can impose the death penalty. This states the rule too strongly. While Mississippi requires that jurors find the existence of each aggravating circumstance beyond a reasonable doubt, the jury may return the death penalty if the aggravating circumstances are not outweighed by the mitigating circumstances. This allocation of proof accords with the capital sentencing procedures which the Court has upheld as facially valid. See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). We therefore reject Gray's claim.
677 F.2d at 1107.
We, therefore, find no merit in this assignment.
Finally, Hill complains of the lower court's refusal to grant instruction D-1 which authorizes the jury to consider any other circumstances surrounding his life *443 that would be reasonably relevant to the question of his sentence. Since the court stated substantially the same thing as state's instruction 3-A, the defense instruction was not necessary. See, e.g., Jones v. State, 381 So.2d 983 (Miss. 1980), cert. denied, 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (1980).
We have reviewed the record and compared it with all of our decisions subsequent to Jackson v. State, 337 So.2d 1242 (Miss. 1976), involving the death penalty. Some have been affirmed and some reversed. After such comparison, we conclude that the death penalty here is not excessive in the light of the aggravating and mitigating circumstances. We further find that the infliction of the death penalty on Alvin Hill is not disproportionate, wanton or freakish when compared to cases involving similar crimes, the facts surrounding them and the defendants.
We also find that the sentence of death was not imposed under the influence of passion prejudice or any other arbitrary factors, and that the evidence overwhelmingly supports the jury's finding of statutory aggravating circumstances in that the capital murder was committed while the defendant was engaged in the commission of robbery; that the capital offense was committed for pecuniary gain; that the defendant was previously convicted of a felony involving the use or threat of violence to the person; and that the capital offense was especially heinous, atrocious or cruel. The execution of Hill will be consistent and evenhanded in the light of all post Jackson death penalty cases considered by this Court.
The judgment of the lower court is affirmed and Wednesday, June 15, 1983, is set as the date for execution of the sentence and infliction of the death penalty in the manner provided by law.
AFFIRMED.
All Justices concur as to guilt phase.
As to Part IV: HAWKINS, J., and PATTERSON, C.J., dissent.
As to Part IV: ROBERTSON, J., joins Section I only.
ROBERTSON, J., and PATTERSON, C.J., concur in part and dissent in part.
ROBERTSON, Justice, concurring in part, dissenting in part:

I. Introduction

A. The Three Errors Below

With practically all of what has been said in the majority opinion of Justice Hawkins, I concur. More specifically I concur in all of Parts I and II and all of Part III except subpart (e). I dissent from Parts III(e) and IV. Without doubt, the evidence is clear that Alvin Hill brutally murdered Robert Lee Watkins on July 12, 1979. I expressly join in the Court's affirmance of Hill's conviction.
In my view, however, three errors occurred in the proceedings before the trial court which should require that the sentence of death be vacated and that the case be remanded for a new trial on the question of sentence only.
First, the prosecution elicited from the codefendant Gregory Tucker that, arising out of the same operative events as the case at bar, Tucker had been convicted of manslaughter. The majority correctly and unequivocally states that "... this constituted error" (emphasis added), citing Buckley v. State, 223 So.2d 524, 528 (Miss. 1969), but then inexplicably holds that Hill should be dispatched to the gas chamber because his lawyer did not object.
Second, the state's attorney argued to the jury at the sentencing phase that its verdict was not the "last word", that other courts would review any death penalty. The indisputable effect of the argument was to "minimize or disturb" the jury's primary role in sentencing under our capital murder statute. Again we agree with the majority that this argument was "clearly erroneous" and "highly prejudicial". Howell v. State, 411 So.2d 772 (Miss. 1982) is indeed controlling. We do not understand how the court can in the next breath hold the point procedurally barred.
*444 Third, the circuit court refused to grant Hill's requested Instruction D-2. That instruction would have advised the jury of its prerogative and power to refuse to impose the death sentence no matter what  a power the jury clearly had. I join with Justice Hawkins in his opinion that this was error.
These three errors ought to require vacation of the death sentence imposed upon Hill. Because the majority holds otherwise, I respectfully dissent.

B. The Target: Procedural Bars in Death Penalty Cases

My principal target is the statement in Part III(e) of the majority opinion, at pages 439-440, that this Court has consistently applied a contemporaneous objection rule in death penalty cases. The statement is wrong as a matter of fact. Far more of our cases going back over the decades have declined to invoke procedural bars in capital cases. Beyond that, the statement is wholly at odds (a) with constitutional imperatives enunciated by the Supreme Court of the United States, (b) with the mandate of the legislature of this state regarding appellate review, Miss. Code Ann. § 99-19-105, and (c) with this Court's plain error rules, Miss.Sup.Ct.Rules 6(b) and 42.
Without doubt the state has an interest in achieving finality in litigation, even death penalty litigation. Contemporaneous objection and other procedural rules, when fairly enforced, no doubt promote legitimate state interests in non-capital cases. But death is different. Surely the State of Mississippi has no interest as great as its interest in assuring that, before a man suffers the irrevocable penalty of death, he be accorded every substantive right and protection known to our law, procedural niceties to the contrary notwithstanding. No such contrary interest has been identified in the majority opinion, nor could it be.
Make no mistake about the implications of the procedural bar the majority imposes upon Alvin Hill. It presumes that Hill's rights secured in the positive laws of this state have been violated. The majority notes  then overlooks  two errors, each of which standing alone has in the past been sufficient to vitiate non-capital convictions and sentences. What state interest requires this fateful step eludes me.
I have addressed this proposition briefly in my special concurring opinion in Edwards v. Thigpen, 433 So.2d 906, 909 (Miss. 1983). In Edwards, my view on the merits of the issues tendered was that petitioner was entitled to no relief. The case at bar, however, as the majority correctly notes, is different. Were it not for the procedural sluggishness of defense counsel, Alvin Hill would be entitled to reversal here. In Edwards, counsel's procedural defaults were in my view harmless because the points were substantively meritless. Because here Hill's attorney's failures have, if the majority opinion becomes the last word, become catastrophic, I wish to set forth my views at some length.

II. The Uniqueness Of The Death Penalty

A. The United States Supreme Court Says Death is Different

I begin with the a priori constitutional imperative  that the penalty of death is qualitatively different from any other form of punishment known to our society. The Supreme Court of the United States has in recent years repeatedly recognized the uniqueness of the death penalty. Concurring in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), Justice Stewart wrote:
"The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity." 408 U.S. at 306, 92 S.Ct. at 3760.
This theme, the unique nature of the death penalty, has been repeated time and time again. See, e.g., Furman v. Georgia, supra, 408 U.S. at 287-289, 92 S.Ct. at 2751, 3752, 33 L.Ed.2d 376-378 (Brennan, J., concurring); *445 Gregg v. Georgia, 428 U.S. 153, 187-188, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976); Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976); Gardner v. Florida, 430 U.S. 349, 357-358, 97 S.Ct. 1197, 1204-05, 51 L.Ed.2d 393, 402 (1977); Coker v. Georgia, 433 U.S. 584, 598, 97 S.Ct. 2861, 2869, 53 L.Ed.2d 982 (1977); Lockett v. Ohio, 438 U.S. 586, 604-605, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973, 989-990 (1978); and Beck v. Alabama, 447 U.S. 625, 638, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392, 393, 403 (1980).
Because capital punishment is "qualitatively different", Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1978) holds that
"there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment." 428 U.S. at 305, 96 S.Ct. at 2991.
Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), observes, in a somewhat different context, that the penalty of death is "so profoundly different" that a greater degree of sentencing reliability is required. 438 U.S. at 604-605, 98 S.Ct. at 2964-65. Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), posits as the goal of a capital trial a process which
"insure[s] that the death penalty is indeed imposed on the basis of `reason rather than caprice or emotion.'" 447 U.S. at 638, 100 S.Ct. at 2390.
That death is different is a fundamental notion that underlies and helps explain much of what we say below.

B. In More Practical Ways, The Supreme Court of Mississippi Recognizes That Death is Different

This Court recognized that death was different long before the above utterances of the Supreme Court of the United States. This recognition has manifested itself in varying forms.

1. Trial Errors Viewed For Their Cumulative Impact

The Court has an established tradition in capital cases of considering trial errors for their cumulative effect. In setting aside a guilty verdict and sentence of death in a murder case, Russell v. State, 185 Miss. 464, 189 So. 90 (1939), holds:
"It is true that not one of the errors, when considered separately and apart from the others, is sufficient to justify a reversal of the case, but when they are considered as a whole it is our view that they resulted in the appellant being denied a fair trial... ." 185 Miss. at 469, 189 So. at 91.
Indeed, this Court has recently sanctioned the practice of cumulating errors in a non-capital case. Collins v. State, 408 So.2d 1376, 1380 (Miss. 1982).

2. The Plain Error Rule is Liberally Applied

The policy of allowing a defendant in a capital case to cumulate the errors at trial were none individually justifies reversal, enunciated in the Russell case, has a corollary: meritorious grounds for reversal should be considered by the Court without regard to procedural niceties. In Augustine v. State, 201 Miss. 731, 29 So.2d 454 (1947), the Court stated:
"We have searched in the record in vain for some ground on which to reverse the conviction. We use the expression, `searched', because we have felt it our duty to reverse the case if we could find grounds for so doing." 201 Miss. at 740, 29 So.2d at 454.
Ross v. State, 185 Miss. 438, 188 So. 295 (1939) finds this Court accepting its duty to be mindful that sometimes "a spirit of community vengeance finds its way into a jury verdict." 185 Miss. at 445, 188 So. at 296. See also Gipson v. State, 203 Miss. 434, 437, 35 So.2d 327, 328 (1948).
This, of course, is nothing more than a common law plain error rule. Compare Rule 6(b), Miss.Sup.Ct.Rules. In death penalty cases, errors less plain and less noticeable are grounds for reversal.

3. Contemporaneous Objection Rule Greatly Relaxed

In the context of jury instructions not objected to at trial, we note Rule 42 of the *446 rules of this Court, the last sentence of which reads
"In extreme cases this Court may raise an objection to a jury instruction in order to prevent manifest injustice."
This Court has employed the above quoted sentence to hold that capital cases are "extreme cases" and that the contemporaneous objection rule does not apply in such cases. Toney v. State, 298 So.2d 716, 721 (Miss. 1974); Culberson v. State, 379 So.2d 499, 506 (Miss. 1980); (Rule 42 waived "with reluctance and only because this is a capital case"). See also Bell v. State, 360 So.2d 1206, 1215, 1217-1218 (Miss. 1978).

4. Doubts Regarding Errors Resolved in Favor of Accused

Fourth, bona fide doubts are resolved in favor of the accused. In Gambrell v. State, 92 Miss. 728, 46 So. 138 (1908), a death penalty case, the Court held that
"Whenever there is any serious doubt in the law as to whether or not certain proof is or is not permissible, a safe rule to pursue is to solve the doubt in favor of the accused and permit the testimony to go to the jury." 92 Miss. at 736, 46 So. at 138.
The Court then applied the same rule to close questions regarding jury instructions.
"What is here said in reference to admitting testimony in cases of serious legal doubt equally applies to the granting of instructions in favor of the accused." 92 Miss. at 736, 46 So. at 138.

5. Heightened Scrutiny on Appeal

All of this culminates in the more recently recognized proposition that appellate review in capital cases is different from that in other cases. Irving v. State, 361 So.2d 1360 (Miss. 1978) observes:
"We recognize that thoroughness and intensity of review are heightened in cases where the death penalty has been imposed. [Citation omitted] What may be harmless error in a case with less at stake becomes reversible error when the penalty is death." 361 So.2d at 1363.
Reaffirmed in Laney v. State, 421 So.2d 1216, 1217 (Miss. 1982).

C. Our Sister States Likewise Recognize that Death is Different

This Court hardly stands alone among state courts of last resort in recognizing that death is different. In many other jurisdictions we find the same careful protective approach to appellate review of capital cases.
For example, in State v. Mount, 30 N.J. 195, 152 A.2d 343 (N.J. 1959), the defendant appealed his judgment of conviction and death sentence to the Supreme Court of New Jersey. The Court stated:
"But where a life is at stake, this court does not hesitate in the interests of justice to invoke the plain error rule (R.R. 1:5-1) and to reverse where the trial errors were impregnated with the likelihood of having harmed the substantial rights of the defendant." 152 A.2d at 352.
In a similar context, the Supreme Court of Alabama, in Alberson v. State, 254 Ala. 87, 47 So.2d 182 (1950), has stated:
"Perhaps it is well to note that in reviewing a death [penalty] case under the automatic appeal statute, supra, we may consider any testimony that was seriously prejudicial to the rights of the appellant and may reverse thereon, even though no lawful objection or exception was made thereon."
See also, Duncan v. State, 278 Ala. 145, 176 So.2d 840, 851 (Ala. 1965).
Even though no exception was taken to the overruling of a motion for a new trial and thus there was nothing legally before it for review, the Supreme Court of Missouri, in State v. Black, 186 S.W. 1047, 1048 (Mo. 1916) "ex gratia and out of caution", examined the entire record, "owing to the fact that Defendants have been sentenced to death."
The Supreme Court of Connecticut, in State v. Walters, 145 Conn. 60, 138 A.2d 786, 789 (1958), has said:
"The claim that the court should have dismissed the jury without more as soon as the foreman reported the `hopeless disagreement' was not made, as it should *447 have been, at the time, but was deferred until the following morning after the court had given the first portion of the charge from State v. Smith [49 Conn. 376]. However, since this is a capital case, we overlook this technical infirmity in the claim." [Emphasis added] 138 A.2d at 789.
The Supreme Court of Idaho has also recognized, in State v. Foyte, 43 Idaho 459, 252 P. 673 (1927), that justice demands less stringent application of appellate court review procedures where the Defendant has been sentenced to die:
"This court has frequently held in criminal cases that it would not consider errors in the admission of evidence unless exceptions thereto were preserved. But it has never so held in a capital case... .
Mere inadvertence of counsel to except should not preclude a defendant, with life at stake, from claiming the right of fair trial." 252 P. at 674.
In North Carolina a general rule exists that objections to arguments to the jury must be duly and timely made. Relaxing this rule, the Supreme Court of North Carolina held that a defendant in a capital case can belatedly make this objection even after the verdict is returned.
"Furthermore, an exception to improper argument of a solicitor or other counsel for the State may be entered after verdict, where the verdict rendered requires the court to enter a death sentence and the harmful effect of the argument is such that it may not be removed from the minds of the jurors. State v. Hawley, 229 N.C. 167, 48 S.E.2d 35; State v. Little, [228 N.C. 417, 45 S.E.2d 542] supra, State v. Noland, [85 N.C. 576] supra." State v. Dockery, 238 N.C. 222, 77 S.E.2d 664, 667 (1953).

III. Procedural Perfection in Preservation of Error Has Never Been Demanded in Death Penalty Cases

A. The Majority's Cases Do Not Support The Procedural Bar Invoked Here On Alvin Hill

The cases relied upon by the majority do not support the proposition for which they are necessarily cited here, to-wit: that failure to preserve procedurally an otherwise reversible error is sufficient to preclude this Court's consideration of the point in its review of the imposition of the penalty of death upon Alvin Hill.
The majority relies upon eight cases. See Part III(e), pages 439-440. These are: Coleman v. State, 378 So.2d 640 (Miss. 1979); Thomas v. State, 358 So.2d 1311 (Miss. 1978); Griffin v. State, 292 So.2d 159 (Miss. 1974); Myers v. State, 268 So.2d 353 (Miss. 1972); Peterson v. State, 242 So.2d 420 (Miss. 1970); Ford v. State, 227 So.2d 454 (Miss. 1969); Showers v. State, 227 So.2d 452 (Miss. 1969); and Coburn v. State, 250 Miss. 684, 168 So.2d 123 (1964).
First, not one of these cases involves the affirmance of a death sentence!
Second, three of these cases  Thomas, Ford and Showers, were not even murder cases. Two more, Griffin and Coburn, were murder cases in which a life sentence had been imposed in the trial court. Only Coleman, Myers and Peterson are cases where the death penalty had been imposed in the trial court, but in each of those three cases the sentence of death was vacated for varying reasons.
Absent citation to a case in this Court where an otherwise reversible error was held precluded from consideration on the merits by virtue of a failure timely to preserve the point for appeal, and where the death sentence was in fact affirmed, we suggest that the majority holding is simply without precedent in this state.

B. A Half Century's Precedents Expressly or By Clear Implication Support the Proposition that Procedural Bars are Not Invoked to Affirm Death Sentences

The majority holding is contrary to the dominant philosophy of the overwhelming majority of the death penalty cases which have been reviewed in this Court. It is contrary to the expressed or clearly implied premises of fifty years' worth of death penalty cases decided in this Court.
*448 Without belaboring the point, we list the following cases as a representative sampling of the occasions on which this Court, in cases in which the death penalty has been imposed by the trial court, has ignored procedural requirements for preservation of error and has proceeded to decide on the merits the issues, unpreserved or unassigned, tendered by the defendant. Fisher v. State, 145 Miss. 116, 134, 110 So. 361, 365 (1926) (failure to contemporaneously object to a confession did not preclude reversal because "constitutional rights of a person on trial for his life rise above mere rules of procedure."); Ross v. State, 185 Miss. 438, 445, 188 So. 295 (1939) (Court's duty to apply "closest scrutiny" to death penalty cases since community vengenance may taint the verdict); Carter v. State, 198 Miss. 523, 528, 21 So.2d 404 (1945) (errors affecting fundamental rights present an exception to the general rule that errors cannot be raised for the first time on appeal); Musselwhite v. State, 212 Miss. 526, 539, 54 So.2d 911, 914-15 (1951) (merits of an evidentiary issue reached even though trial court was not afforded an opportunity to pass on the proposition); Bell v. State, 360 So.2d 1206, 1215, 1216-18 (Miss. 1978) (erroneous instructions not urged on appeal still considered); Voyles v. State, 362 So.2d 1236, 1237 (Miss. 1978) (court carefully studied every aspect of the case to insure that unassigned errors were not present); Culberson v. State, 379 So.2d 499, 506 (Miss. 1980) (instruction question considered on merits though no formal objection lodged); Wheat v. State, 420 So.2d 229, 239 (Miss. 1982) (same). The holdings of these cases find their exegesis in the expressed policy that, notwithstanding an appellant's failure to file assignments of error and brief, and notwithstanding that such cases are subject to dismissal, this Court, in capital cases, will nevertheless read the record and search for errors to insure that the "extreme penalty" is not unjustly exacted. Gipson v. State, 203 Miss. 434, 437, 35 So.2d 327, 328 (1948); Shaffer v. State, 46 So.2d 545, 545 (Miss. 1950); Russell v. State, 226 Miss. 885, 885, 85 So.2d 585 (1956); Drake v. State, 228 Miss. 589, 590, 89 So.2d 593 (Miss. 1956); Irving v. State, 228 So.2d 266, 268 (Miss. 1969).
Suffice it to say that, in view of the considerations outlined in Section II(B) of this opinion above, it is hardly surprising that these and many other cases may be found in our reports declining to impose procedural bars in death penalty cases.[1]

IV. Invoking Procedural Bars Produces Arbitrary Factors This Court Has Been Legislatively Ordered To Root Out Via Sentence Review

A. Sentence Review in Search of Arbitrary Factors Is In Addition To Ordinary Appeal

The Mississippi Legislature has mandated automatic sentence review by this Court in each case in which a death verdict is returned. Miss. Code Ann. § 99-19-105 (Supp. 1982). The statute expressly provides that
"The sentence review shall be in addition to direct appeal... ." § 99-19-105(6)
This Court is directed to "consider the punishment as well as any errors enumerated by way of appeal." § 99-19-105(2).
The statutory scheme thus provided is clear. A convicted defendant may appeal his conviction and sentence as in any other case. On appeal only, the same rules regarding preservation of errors below apply *449 as in a non-capital case. Where the sentence imposed below is death, however, review of the sentence only occurs without regard to preservation of error below or specification of error in this Court.
In performing its automatic sentence review this Court is directed to consider similar cases. It is likewise directed to consider whether the sentence of death was imposed under the influence of "any ... arbitrary factor". § 99-19-105(3)(a). This mandate that similar cases be compared and contrasted coupled with the charge to root out arbitrary factors are important here. They provide a legislatively mandated undergirding of the fundamental thesis of this opinion: that procedural bars may not lawfully be invoked in this state to affirm death sentences.
We can think of no more arbitrary factor than having nimbleness of counsel on points of procedure determine whether Alvin Hill lives or dies.

B. Freeing Travis Buckley While Condemning Alvin Hill Is Arbitrary and Capricious

On the first substantive error under discussion, compare this case with Buckley v. State, 223 So.2d 524 (Miss. 1969). In Buckley, the defendant was convicted of kidnapping and sentenced to ten years in prison. This Court reversed his conviction because the trial court erroneously allowed the state to elicit from a codefendant that he (the codefendant) had pled guilty to the kidnapping. Buckley observed that
"The law is well settled in this state that where two or more persons are jointly indicted for the same offense but are separately tried, a judgment of conviction against one of them is not competent evidence on the trial of the other because such plea of guilty or conviction is no evidence of the guilt of the party being tried." 223 So.2d at 528.
This case presents a legally and factually analogous situation. Codefendant Gregory Tucker testified that, arising out of the same facts and circumstances as gave rise to the Hill prosecution, he had been convicted of manslaughter. This is clear grounds for reversal.
How can Travis Buckley's ten year sentence be vacated on the basis of this error while Alvin Hill's death sentence is affirmed? There are only two differences in the cases: Buckley's attorney made timely objection in the trial court, while Hill's did not. Buckley was sentenced to ten years in prison while Hill has been sentenced to death. This latter difference surely renders the first legally irrelevant and thus arbitrary.

C. Freeing Ronald C. Howell While Condemning Alvin Hill Is Likewise Arbitrary and Capricious

Look now at the second error specified above. The district attorney argued to the jury that their verdict was not the last word, that any death sentence would be reviewed in other courts. This same argument was made in the case of Ronald C. Howell, who subsequently received an eight year sentence. Howell v. State, 411 So.2d 772 (Miss. 1982). This Court reversed, holding that it was error for the prosecuting attorney to argue to the jury
"both directly and indirectly by implication, that if they should made a mistake, it would be corrected." 411 So.2d at 777.
Essentially the same thing happened at Alvin Hill's trial. The only difference is that Howell's lawyer timely objected while Hill's did not. If such an error is sufficient to vitiate a conviction and eight year sentence in the Howell case, surely the same result follows in a death penalty case, even though no timely objection was made. Otherwise, we are back at the same sort of arbitrary and capricious infliction of the death penalty this and other courts have striven for years to eliminate.
The Supreme Court of Louisiana has held as much in State v. Lindsey, 404 So.2d 466, 481-484 (La. 1981). In Louisiana appellate sentencing review is mandated in language identical to our statute, § 99-19-105(3)(a). At the sentencing hearing in Lindsey the prosecuting attorney made an improper closing argument. No objection was made. On appeal the state argued that the point *450 was procedurally barred. The Court rejected this argument, stating:
"At no time during the foregoing argument did defense counsel lodge an objection to its content. Ordinarily, this Court would find that the issue had not been preserved for review. C.Cr.P. art. 841. However, because this is a capital case and because this Court has an obligation to examine the record for passion, prejudice or arbitrary factors which may have contributed to the death penalty recommendation, this Court will review the prosecutor's argument for possible reversible error." 404 So.2d at 482-483. [Emphasis added]
I suggest, with great respect and deference for my colleagues, that the approach taken by our sister court from the State of Louisiana, manifest in the Lindsey case, has much to commend it.
In any event, a review of this Court's Howell decision and Louisiana's Lindsey case makes it painfully clear that the sentence review Alvin Hill has received could hardly be called heightened. See II(B)(5) above.

V. Death  Is  Different Errors Occurring At Guilt Phase Require Vacation of Death Sentence Only, Not Conviction

Two of the errors we complain of here  the "last word" argument and the failure to grant the "mercy" instruction  occurred at the sentencing phase. They in no way infect the guilt phase proceeding.
The other matter which in our view mandates reversal occurred at the guilt phase. We refer here to the state's eliciting from Gregory Tucker that he had been convicted of manslaughter. Assuming the correctness of all that we have said above, should this Court vacate the death penalty only, or both the defendant's conviction and sentence?
We have no definitive jurisprudence on the point. For most of our cases cited in Section III above were decided prior to Furman v. Georgia in 1972. The approach taken in these cases must be brought into the bifurcated trial era. Several recent decisions of the Supreme Court of the United States, however, suggest that death-is-different types of errors  even when they occur during the guilt phase  vitiate sentence only.
In Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392, 393 (1980) the Court found error in the trial court's refusal to allow the jury to consider at the guilt phase the question of lesser included offense. The Beck Court, however, vacated the death sentence only. The conviction was left intact. The same may be said of the Supreme Court's most recent exposition of the Witherspoon doctrine in Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). In Adams, where jurors had been improperly challenged for cause the Court again vacated sentence only. Adams' conviction was not disturbed. Finally, in Enmund v. Florida, ___ U.S. ___, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the Court precluded use of the traditional felony murder doctrine to obtain and uphold a death sentence. The felony murder doctrine remains, however, perfectly viable as a basis for convicting one of non-capital murder.
Our path is charted by Beck, Adams and Enmund. Ignoring waivers, procedural bars and the like is mandated only for purposes of reviewing the sentence of death. That death is different, that heightened review is demanded, do not mandate review of the defendant's conviction on terms or conditions other than those which would apply in any other serious criminal case. See Brooks v. State, 209 Miss. 150, 155, 46 So.2d 94, 97 (1950); Read v. State, 430 So.2d 832 (Miss. 1983). For these reasons, were I writing for the majority, I would vacate Alvin Hill's death sentence but leave undisturbed his conviction of the crime of capital murder. I would then remand the case for a new trial on the question of sentence only, carefully instructing the trial court that the three errors noted here should not be permitted to occur anew.

VI. A Deliberate Bypass Exception

There is one notable exception to what we say above. Where competent defense *451 counsel, as a matter of conscious trial strategy, has affirmatively chosen to exploit a matter otherwise inadmissible, his claims here of trial error should fall on deaf ears. For example, if defense counsel had elicited the fact of Gregory's manslaughter conviction as a part of a deliberate tactic to convince the jury that Gregory was the villain, not Hill, I would concur with the majority. Invited error should not form the basis for reversal even in capital cases.[2]
I carefully distinguish that situation from the one we have here. Defense counsel did not put the fact of Gregory's conviction before the jury. The state did. Once the cat is out of the bag, defense counsel cannot be expected to sit back and pretend nothing has happened. He is duty bound to mitigate the effect of this damaging evidence. And if he does so by adjusting his trial strategy so that thereafter he is pointing the finger at Gregory, the point is still available on appeal. It is wholly unrealistic and unfair for us to plant procedural error preservation pitfalls in front of counsel whose eyes should be fixed predominantly on the verdict that jury will return.
In short, where defense counsel has a matter of trial strategy deliberately bypassed on procedural opportunity at trial, he may not complain here if his strategy doesn't work.
Two points bear emphasis: First, the benefit of the doubt on whether there has been a deliberate bypass at trial should always go to the defendant. Cf. Gambrell v. State, 92 Miss. 728, 736, 46 So. 138, 139 (1908). Second, too many findings of deliberate bypass via trial strategy can form the basis for a persuasive claim of ineffective assistance of counsel.

VII. Conclusion

I will summarize briefly. The state elicited from the codefendant Gregory Tucker, a companion of Hill on July 12, 1979, that he had already been convicted of the manslaughter of Robert Lee Watkins. This was prejudicial and reversibly so. Buckley v. State, 223 So.2d 524, 528 (Miss. 1969). The prosecuting attorney argued to the jury at sentencing that its verdict was not the "last word" on whether Alvin Hill would live or die. This was prejudicial and reversibly so. Howell v. State, 411 So.2d 772 (Miss. 1982). Finally, the Circuit Court refused to advise the jury of its power and prerogative to refuse to impose the death penalty, no matter how great the aggravating circumstances and no matter how lacking and mitigating circumstances. See Justice Hawkins' dissenting opinion.
Because of these three errors and even though the first two have not been technically preserved below, I would vacate the sentence of death imposed upon Hill and remand for a new trial on the question of sentence only  where, of course, none of these errors would be repeated.
I thus join in the affirmance of Hill's conviction of the capital murder of Robert Lee Watkins but respectfully dissent from the affirmance of his sentence of death.

VIII. A Word On Another Subject  Burden of Proof at Sentencing

A. There Must Be Some Burden of Proof At Sentencing

A final word about the burden of proof at the sentencing phase. I do not expressly join in Section II of Justice Hawkins' dissenting opinion as to Part IV. It seems to me, however, that some burden of proof must be approved and utilized at sentencing.
In my view, two separate and distinct questions are presented. First, should the jury be instructed that there is any burden of proof at all involved in their weighing and balancing aggravating circumstances and mitigating circumstances? Only if this question is answered in the affirmative do we reach the second question: what should that burden of proof be and upon whom should it rest?
*452 I am greatly concerned about the failure of the trial court to give the jury any instruction at all regarding the burden of proof to be applied. I am not aware of any other situation in which an issue is to be resolved by the jury where the trial court does not advise the jury of the applicable burden of proof, and upon whom it rests. It appears to me that we have here one of the remaining vestiges of the "unfettered discretion" death sentencing system condemned in Furman v. Georgia, supra, back in 1972.

B. What Should That Burden of Proof Be?

In addition to the points made by Justice Hawkins, there are other persuasive bases upon which one may argue that the state should bear the burden of proving beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. In this connection, we invite consideration of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). See also State v. Dixon, 283 So.2d 1, 9 (Fla. 1973).
Jackson v. Virginia revitalized and reconfirmed the constitutional proportions of the "beyond a reasonable doubt" standard in federal review of state criminal convictions. Jackson held that habeas corpus relief must be granted unless sufficient evidence was offered at the state court trial to allow a rational fact finder to conclude beyond a reasonable doubt that the criminal defendant had committed each element of the offense.
Four years earlier, the Supreme Court had made it clear that the same considerations  together with the beyond a reasonable doubt rule  applied to substantial findings which may affect sentence, not just guilt or innocence. In Mullaney, the Court held that the state has the burden of proof on the question of the degree of murder. The consequences, i.e., prospective sentence, of course, can vary greatly from murder to manslaughter. Under the Maine scheme there under review, the state had only to prove homicide, the defendant being left with the burden of proving that his offense was not murder. Mullaney invoked the due process clause to strike down Maine's system, holding that constitutionally the state must bear the burden of proof. The reason the state has this burden of proof, the beyond the reasonable doubt burden, is that the sentencing "consequences... [of a murder conviction vis-a-vis manslaughter conviction] differ significantly" 421 U.S. at 698, 95 S.Ct. at 1889.
If the "beyond a reasonable doubt" burden rested with the state under Mullaney, how much more applicable should it be when there is at stake the profound and qualitative difference between the death penalty and any term of years, no matter how long?
The Mullaney principles have been reaffirmed by Jackson v. Virginia, supra, involving federal habeas corpus review of a state court conviction. Those constitutional principles, of course, are applicable in the state of Mississippi.

C. Another Arbitrary Factor?

We note that in two recently tried capital murder cases, both of which are now pending before this Court on appeal, the beyond a reasonable doubt instruction requested by Alvin Hill was in substance given by the trial court. See Tokman v. State, 435 So.2d 664 (Miss. 1983), Docket No. 53,676, Instruction No. 12, R. pp. 616-618; and Leatherwood v. State, 435 So.2d 645 (Miss. 1983), Docket No. 53,914, Instruction Nos. 2 and 3, R. pp. 862-865.
Some consistency on this point must be developed from county to county, else there be introduced into our capital sentencing system the sort of arbitrary factor we have been ordered to root out via sentencing review. See my Section IV above.
PATTERSON, C.J., joins in this opinion.
HAWKINS, Justice, dissenting as to Part IV:

I.
When the circuit judge was considering the model instruction approved under our *453 Criminal Procedure Rules, and given during the sentencing phase of a capital murder trial, defense counsel had some question about some of the aggravating circumstances proposed by the state, but stated that if instruction D-2 were given it would remove their objection.
The court then inquired if D-2 was not in conflict with the wording that had to be given in other instructions. He then stated:
THE COURT: I don't think I can give D-2. I don't think there's any basis in law for that instruction.
* * * * * *
THE COURT: D-2 is refused. It just doesn't work in with what I'm required to do.
(R. 1175).
It is thus apparent the trial judge was of the opinion, not that D-2 was adequately covered by other instructions given, but that it was in conflict with instructions he was required to give, and that he had no lawful authority to even give this instruction.
Instruction D-2 reads as follows:
Ladies and gentleman of the jury, I charge you that you need not find any mitigating circumstance in order to return a sentence of life imprisonment. A life sentence may be returned regardless of the evidence.
(R. 413).
That the jury in a murder case had the unrestrained and unfettered discretion to determine, regardless of the evidence, whether the accused should receive a life sentence or death was beyond question in this state until the United States Supreme Court decisions in 1972. Any instruction which told the jury that under a certain set of circumstances it would be obligated by law to return the death penalty would have been condemned by this Court.
We settled this point over a century ago in Spain v. State, 59 Miss. 19 (1881). It is well worth our time to revisit this case.
In 1872 the Legislature passed an act providing that conscientious scruples against the infliction of the death penalty would not disqualify a person from being a juror in a capital murder case. In 1875 the Legislature repealed the 1872 act, but the right of the jury to fix the punishment at imprisonment for life was declared. Id. at 24. Following Spain's trial, the jury found him guilty but recommended mercy. According to the trial judge, the following transpired:
[T]he court ordered the jury to be conducted back to their room, apprising them that they would find a form for their verdict in the second charge for the State. This instruction is that, if the jury simply find the accused guilty as charged in the indictment, it will be the duty of the court to pronounce the death penalty; but, if the evidence in the case warrants them in so doing, they may find him guilty as charged, "and declare that the punishment to be inflicted shall be imprisonment in the penitentiary for life," or they may find the defendant not guilty. Afterwards the jury rendered a verdict of guilty as charged, and the appellant was sentenced to be hanged.
Id. at 19-20 (emphasis added).
This instruction was condemned because it "made the right of the jury to fix the punishment to depend on its view that the evidence warranted it... ." Id. at 25.
This Court also stated:
The judgment must be reversed, because of the second instruction given at the instance of the State. It limits and qualifies the right of the jury to fix the punishment at imprisonment for life, whereas the law confers on the jury this right without qualification or restriction. The right of the jury to fix the punishment as indicated is without any condition. The most atrocious crime committed under the most aggravating circumstances may be punished by imprisonment for life, instead of by death, if the jury so determines by its verdict. The law demands a jury willing to be the instrument of visiting the penalty of death, and confers on such a jury the *454 unconditional right to fix the punishment at imprisonment for life. It was erroneous to instruct the jury that its right was dependent on any state of the evidence or on any view it might take of it.
Id. at 24.
Unless this salutary principle, so eloquently stated and recognized by our Court over a hundred years ago, was changed by United States Supreme Court decisions beginning in 1972, or enactment of our Legislature subsequent thereto, it is incomprehensible to me to argue otherwise.[1]
Equally clear is that no United States Supreme Court decision has suggested the United States Constitution requires that a jury be deprived of this unfettered authority to return a life sentence as opposed to a death penalty verdict, irrespective of the evidence.
Many varied pronouncements regarding the death penalty have come from the tangle of subtleties and complexities in which the United States Supreme Court has engaged, and which we are obligated to follow. Yet, no member of that Court has suggested the states remove from juries this unabridged authority to extend mercy, an authority that did not spring full grown, but evolved after centuries of human experience.
A brief review of these seminal cases is in order.
In McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), the United States Supreme Court gave the history of capital punishment in both England and this country. Id. at 197-208, 91 S.Ct. at 1462-67. The Court observed the rebellion in this country against the common law rule imposing a mandatory death sentence on all convicted murderers. To meet this, legislatures attempted to define degrees of murder, for which only the most serious mandated a death sentence. This, too, in time, proved unworkable, because jurors "on occasion took the law into their own hands in cases which were `willful, deliberate, and premeditated' in any view of that phrase, but which nevertheless were clearly inappropriate for the death penalty. In such cases they simply refused to convict of the capital offense." Id. at 199, 91 S.Ct. at 1463 (citations omitted).
The Court further stated:
In order to meet the problem of jury nullification, legislatures did not try, as before, to refine further the definition of capital homicides. Instead they adopted the method of forthrightly granting juries the discretion which they had been exercising in fact... . Tennessee was the first state to give juries sentencing discretion in capital cases ... but other states followed suit, as did the Federal Government in 1897.
Id. at 199-200, 91 S.Ct. at 1463 (citations and footnotes omitted).[2]
In McGautha it was argued for the first time that the total absence of any standards being given a jury as to when it should and should not impose the death penalty had resulted in freakish and unpredictable imposition of the death penalty in which there was no pattern, except for the death penalty being inflicted predominantly on poor and minority groups.
The absence of any standards or guidelines, it was argued, violated the due process clause of the Fourteenth Amendment.
While recognizing that "academic and professional sources have suggested that jury sentencing discretion should be controlled by standards of some sort", Id. at 202, 91 S.Ct. at 1464, the Court rejected the argument. The Court then stated: "To identify before the fact those characteristics *455 of criminal homicides and their perpetrators which call for the death penalty, and to express these characteristics in language which can be fairly understood and applied by the sentencing authority, appear to be tasks which are beyond present human ability." Id. at 204, 91 S.Ct. at 1466.
McGautha's sage counsel was that any such effort would fail.
The United States Supreme Court again addressed the unfettered discretion of juries as to when the death penalty should or should not be imposed in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).[3] In Furman, the petitioners charged that this method of imposing the death penalty violated the Eighth Amendment proscription against cruel and unusual punishment.
Three members of the Court (Douglas, Stewart, and White) agreed. Two members of the Court (Brennan and Marshall) considered the death penalty itself an Eighth Amendment violation. The four remaining Court members (Burger, Blackmun, Powell, and Rehnquist) found no Eighth Amendment violation.[4] Excerpts from seven of the Justices' opinions are set forth in an appendix to this opinion.
Following Furman 35 states re-enacted death penalty statutes in efforts to meet the guidelines of that case.[5]
The United States Supreme Court in 1976 was faced with five death penalty cases from states which had re-enacted death penalty statutes to comply with Furman. We analyzed these cases in Jackson v. State, 337 So.2d 1242 (Miss. 1976).
In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court affirmed a Georgia statutory sentencing procedure quite similar to Mississippi's. The following observations from that opinion concerning the Georgia sentencing procedure and decisions of that Court are pertinent:
The jury is not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court, see § 27-2302 (Supp. 1975), but it must find a statutory aggravating circumstance before recommending a sentence of death.
428 U.S. at 197, 96 S.Ct. at 2936 (emphasis in original).
* * * * * *
Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.
Id. at 199, 96 S.Ct. at 2937.
* * * * * *
The Georgia Legislature has plainly made an effort to guide the jury in the exercise of its discretion, while at the same time permitting the jury to dispense mercy on the basis of factors too intangible to write into a statute, ...
Id. at 222, 96 S.Ct. at 2947.
* * * * * *
In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; *456 it is always circumscribed by the legislative guidelines.
Id. at 206-07, 96 S.Ct. at 2941.[6]
In Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), the North Carolina legislature re-enacted its death penalty statute, but permitted the jury to recommend mercy. In affirming a conviction under the new statute, the North Carolina Supreme Court held this provision authorizing jury discretion to be unconstitutional, but severable, and that the statute without this provision was constitutional. In vacating the judgment the Court stated:
It is now well established that the Eighth Amendment draws much of its meaning from "the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. [86] at 101, [78 S.Ct. 590 at 598, 2 L.Ed.2d 630] (plurality opinion). As the above discussion makes clear, one of the most significant developments in our society's treatment of capital punishment has been the rejection of the common-law practice of inexorably imposing a death sentence upon every person convicted of a specified offense. North Carolina's mandatory death penalty statute for first-degree murder departs markedly from contemporary standards respecting the imposition of the punishment of death and thus cannot be applied consistently with the Eighth and Fourteenth Amendments' requirement that the State's power to punish "be exercised within the limits of civilized standards." Id., at 100, [78 S.Ct. 590 at 598, 2 L.Ed.2d 630].
428 U.S. at 301, 96 S.Ct. at 2989 (footnote omitted).
In Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), the Court interpreted a Louisiana statute where the discretion of the jury had been abolished, and which made conviction of first degree murder mandate the death penalty. The jury had no choice: a finding of guilt for this crime required the trial court to sentence the accused to death. Again, the Court set the death sentence aside and remanded. The opinion noted: "The history of mandatory death penalty statutes indicates a firm societal view that limiting the scope of capital murder is an inadequate response to the harshness and inflexibility of a mandatory death sentence statute." Id. at 332, 96 S.Ct. at 3005 (citation omitted).
In summary, the United States Supreme Court has stated that the Constitution puts no limitations upon a jury's unabridged authority to return a life sentence verdict. On the other hand, the Constitution requires that a jury must be given clear guidelines to follow before it is authorized to return a death penalty verdict.
What was the procedure we adopted in Mississippi? In Jackson v. State, supra, after analysis of the United States Supreme Court decisions, we stated:
The jury shall not be required to make a special finding of any mitigating circumstance in order to return a verdict that the accused should be sentenced to life in prison. However, before the jury may return a verdict that the defendant should suffer the penalty of death, they must unanimously find in writing that after weighing the mitigating circumstances and the aggravating circumstances one against the other that the mitigating circumstances do not outweigh the aggravating circumstances and that the defendant should suffer the penalty of death.
Id. at 1256.
In Coleman v. State, 378 So.2d 640 (Miss. 1979), we stated:
If the state merely proves the existence of an aggravating circumstance, the jury is free to find it insufficient to warrant death and is not required to automatically impose death. Mississippi's capital murder statute leaves the appellant the option of presenting evidence (mitigating circumstances) on why the death penalty *457 should not be imposed, without requiring him to do so.
Id. at 646-47.
That the Circuit Court of Appeals for the 5th Circuit is convinced the jury retains the discretion of determining whether it will return a death penalty verdict, regardless of the evidence during the sentencing phase, is manifest from the following statement in Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982): "Moreover, even if the jury finds that the aggravating circumstances outweigh the mitigating circumstances, it is not required to impose the death penalty. It may still sentence a defendant to life imprisonment." Id. at 1106 (citation omitted).
The majority opinion holds, however, that a jury may not be instructed that it can do precisely what we have said it is fully authorized to do.
Not only does such a construction overrule our present cases, it moves the clock back to an age and practice this state found unconscionable over a century ago, and rejected. Such construction will most assuredly make us open to the attack of violating the "evolving standards of human decency."

II.
Hill also was refused the following instruction:
In order to impose a death sentence, you must be convinced beyond a reasonable doubt that the totality of the aggravating circumstances outweigh the totality of the mitigating circumstances. If you are not convinced beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, you must return a verdict of life imprisonment.
It is true, as stated in Gray v. Lucas, 677 F.2d 1086, 1107 (5th Cir.1982), that the sentencing statutes do not specifically mandate this burden of proof.
The pertinent portions of Mississippi Code Annotated §§ 99-19-101 and 99-19-103 (Supp. 1981) are as follows:
(1) Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment... . In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances... .
(2) After hearing all the evidence, the jury shall deliberate on the following matters:
(a) Whether sufficient aggravating circumstances exist as enumerated in subsection (5) of this section;
(b) Whether sufficient mitigating circumstances exist as enumerated in subsection (6) of this section, which outweigh the aggravating circumstances found to exist; and
(c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death.
(3) For the jury to impose a sentence of death, it must unanimously find in writing the following:
(a) That sufficient aggravating circumstances exist as enumerated in subsection (5) of this section; and
(b) That there are insufficient mitigating circumstances, as enumerated in subsection (6), to outweigh the aggravating circumstances.
Miss. Code Ann. § 99-19-101 (Supp. 1981).
The jury, if its verdict be a unanimous recommendation of death, shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt. Unless at least one (1) of the statutory aggravating circumstances enumerated in section 99-19-101 is so found or if it is found that any such aggravating circumstance is overcome by the finding of one *458 or more mitigating circumstances, the death penalty shall not be imposed... .
Miss. Code Ann. § 99-19-103 (Supp. 1981)
The sentencing jury is required to determine (1) whether sufficient aggravating circumstances exist; (2) whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist; and (3) based upon these whether the defendant should be sentenced to death or life imprisonment.
To impose the death sentence, the jury is further required to unanimously find (a) that "sufficient aggravating circumstances" exist as enumerated in subsection (5) of § 99-19-101; and (b) that there are insufficient mitigating circumstances as enumerated in subsection (6) to outweigh the aggravating circumstances.[7]
Section 99-19-103 requires that if the jury verdict be a recommendation of death, it shall designate the aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt. Unless it finds at least one of the aggravating circumstances, it cannot return the death penalty. Or, if the jury finds the aggravating circumstance overcome by one or more mitigating circumstances, the death penalty shall not be imposed.
In summary, the sentencing jury is required to determine this factual issue: Do one or more aggravating circumstances exist? If so, are there one or more mitigating circumstances which outweigh the aggravating circumstance?
Is the sentencing phase of the trial supposed to be meaningful?
As a general rule, the jury in the guilt and sentencing phase are the same. Therefore, a jury which has found a defendant guilty in a capital murder case has of necessity already found at least one aggravating circumstance beyond a reasonable doubt. An examination of the capital murder statute, Miss. Code Ann. § 97-3-19(2)(a)-(f) (Supp. 1981), reveals that the elements required to elevate murder to capital murder are virtually the same as the aggravating circumstances set forth in § 99-19-101(5)(a)-(h).
Therefore, when the same jury which passed upon the guilt of the accused is called upon in the sentencing phase, it would have to change its mind in order not to find beyond a reasonable doubt the aggravating circumstances asserted by the state, because these were the same ingredients of the capital murder charge.[8]
The only meaningful fact-finding function of the jury in the sentencing phase is to determine whether there is one or more mitigating circumstances which outweigh the aggravating circumstance, or circumstances, the aggravating circumstance having already been determined beyond a reasonable doubt.
In this case the jury was given no guideline as to whether the accused or the state had the burden of persuasion in determining whether the mitigating circumstances outweighed the aggravating circumstances, nor the weight of such burden.
It would appear to me that the burden was upon the state to prove that the aggravating circumstances outweighed the mitigating circumstances, and this should be proved beyond a reasonable doubt. This is in accord with well settled principles of the burden of proof in criminal cases, and I cannot see any reason for a departure.
It is my view the trial court erred in not granting this instruction in some form.
PATTERSON, C.J., joins in this dissent.
ROBERTSON, J., joins in Section I only.

APPENDIX
The following are excerpts from seven of the Justices' opinions in Furman v. Georgia,
*459 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
BRENNAN, J., CONCURRING:
* * * * * *
It is a denial of human dignity for the State arbitrarily to subject a person to an unusually severe punishment that society has indicated it does not regard as acceptable, and that cannot be shown to serve any penal purpose more effectively than a significantly less drastic punishment. Under these principles and this test, death is today a "cruel and unusual" punishment.
Id. at 286, 92 S.Ct. at 2750 (emphasis added).
* * * * * *
Death is today an unusually severe punishment, unusual in its pain, in its finality, and in its enormity.
Id. at 287, 92 S.Ct. at 2751.
* * * * * *
Death is truly an awesome punishment. The calculated killing of a human being by the State involves, by its very nature, a denial of the executed person's humanity.
Id. at 290, 92 S.Ct. at 2752.
STEWART, J., CONCURRING:
* * * * * *
On that score I would say only that I cannot agree that retribution is a constitutionally impermissible ingredient in the imposition of punishment. The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve," then there are sown the seeds of anarchy  of self-help, vigilante justice, and lynch law.
The constitutionality of capital punishment in the abstract is not, however, before us in these cases.
Id. at 308, 92 S.Ct. at 2761.
* * * * * *

These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race. See McLaughlin v. Florida, 379 U.S. 184, [85 S.Ct. 283, 13 L.Ed. 222]. But racial discrimination has not been proved, and I put it to one side. I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

408 U.S. at 309-10, 92 S.Ct. at 2762-63 (footnotes omitted) (emphasis added).
MARSHALL, J., CONCURRING:
* * * * * *
The foregoing history demonstrates that capital punishment was carried from Europe to America but, once here, was tempered considerably. At times in our history, strong abolitionist movements have existed. But, they have never been completely successful, as no more than one-quarter of the States of the Union have, at any one time, abolished the death penalty. They have had partial success, however, especially in reducing the number of capital crimes, replacing mandatory death sentences with jury discretion, and developing more humane methods of conducting executions.
This is where our historical foray leads. The question now to be faced is whether American society has reached a point where abolition is not dependent on a successful grass roots movement in particular jurisdictions, but is demanded by the Eighth Amendment. To answer this *460 question, we must first examine whether or not the death penalty is today tantamount to excessive punishment.
Id. at 341-42, 92 S.Ct. at 2778.
* * * * * *
To arrive at the conclusion that the death penalty violates the Eighth Amendment, we have had to engage in a long and tedious journey. The amount of information that we have assembled and sorted is enormous. Yet, I firmly believe that we have not deviated in the slightest from the principles with which we began.
At a time in our history when the streets of the Nation's cities inspire fear and despair, rather than pride and hope, it is difficult to maintain objectivity and concern for our fellow citizens. But, the measure of a country's greatness is its ability to retain compassion in time of crisis. No nation in the recorded history of man has a greater tradition of revering justice and fair treatment for all its citizens in times of turmoil, confusion, and tension than ours. This is a country which stands tallest in troubled times, a country that clings to fundamental principles, cherishes its constitutional heritage, and rejects simple solutions that compromise the values that lie at the roots of our democratic system.
In striking down capital punishment, this Court does not malign our system of government. On the contrary, it pays homage to it. Only in a free society could right triumph in difficult times, and could civilization record its magnificent advancement. In recognizing the humanity of our fellow beings, we pay ourselves the highest tribute. We achieve "a major milestone in the long road up from barbarism" and join the approximately 70 other jurisdictions in the world which celebrate their regard for civilization and humanity by shunning capital punishment.
Id. at 370-71, 92 S.Ct. at 2793-94 (footnotes omitted).
BURGER, C.J., DISSENTING:
* * * * * *
The responsibility of juries deciding capital cases in our system of justice was nowhere better described than in Witherspoon v. Illinois, supra:
"[A] jury that must choose between life imprisonment and capital punishment can do little more  and must do nothing less  than express the conscience of the community on the ultimate question of life or death."
"And one of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system  a link without which the determination of punishment could hardly reflect `the evolving standards of decency that mark the progress of a maturing society'" 391 U.S. [510] at 519 and n 15, [88 S.Ct. 1770 at 1775 and n. 15] 20 L.Ed.2d [776] 783. (emphasis added).

The selectivity of juries in imposing the punishment of death is properly viewed as a refinement on, rather than a repudiation of, the statutory authorization for that penalty. Legislatures prescribe the categories of crimes for which the death penalty should be available, and, acting as "the conscience of the community," juries are entrusted to determine in individual cases that the ultimate punishment is warranted. Juries are undoubtedly influenced in this judgment by myriad factors. The motive or lack of motive of the perpetrator, the degree of injury or suffering of the victim or victims, and the degree of brutality in the commission of the crime would seem to be prominent among these factors. Given the general awareness that death is no longer a routine punishment for the crimes for which it is made available, it is hardly surprising that juries have been increasingly meticulous in their imposition of the penalty. But to assume from the mere fact of relative infrequency that only a random assortment of pariahs are sentenced to death, is to cast grave doubt on the basic integrity of our jury system.
408 U.S. at 388-89, 92 S.Ct. at 2803 (emphasis added).
* * * * * *

*461 Real change could clearly be brought about if legislatures provided mandatory death sentences in such a way as to deny juries the opportunity to bring in a verdict on a lesser charge; under such a system, the death sentence could only be avoided by a verdict of acquittal. If this is the only alternative that the legislatures can safely pursue under today's ruling, I would have preferred that the Court opt for the total abolition.
It seems remarkable to me that with our basic trust in lay jurors as the keystone in our system of criminal justice, it should now be suggested that we take the most sensitive and important of all decisions away from them. I could more easily be persuaded that mandatory sentences of death, without the intervening and ameliorating impact of lay jurors, are so arbitrary and doctrinaire that they violate the Constitution. The very infrequency of death penalties imposed by jurors attests their cautious and discriminating reservation of that penalty for the most extreme cases. I had thought that nothing was clearer in history, as we noted in McGautha one year ago, than the American abhorrence of "the common-law rule imposing a mandatory death sentence on all convicted murderers." 402 U.S., at 198, [91 S.Ct. at 1462, 28 L.Ed.2d at 721]. As the concurring opinion of Mr. Justice Marshall shows, ante, [408 U.S.] at 339 [92 S.Ct. at 2777, 33 L.Ed.2d at 406-07], the 19th century movement away from mandatory death sentences marked an enlightened introduction of flexibility into the sentencing process. It recognized that individual culpability is not always measured by the category of the crime committed. This change in sentencing practice was greeted by the Court as a humanizing development. See Winston v. United States, 172 U.S. 303, [19 S.Ct. 212, 43 L.Ed. 456] (1899); cf. Calton v. Utah, 130 U.S. 83, [9 S.Ct. 435, 32 L.Ed. 870] (1889). See also Andres v. United States, 333 U.S. 740, 753, [68 S.Ct. 880, 886, 92 L.Ed. 1055] (1948) (Frankfurter, J., concurring). I do not see how this history can be ignored and how it can be suggested that the Eighth Amendment demands the elimination of the most sensitive feature of the sentencing system.

408 U.S. at 401-02, 92 S.Ct. at 2810 (emphasis added).
BLACKMUN, J., DISSENTING:
* * * * * *
As I have said above, were I a legislator, I would do all I could to sponsor and to vote for legislation abolishing the death penalty. And were I the chief executive of a sovereign State, I would be sorely tempted to exercise executive clemency... .
Id. at 410, 92 S.Ct. at 2814.
* * * * * *
I do not sit on these cases, however, as a legislator, responsive, at least in part, to the will of constituents. Our task here, as must so frequently be emphasized and reemphasized, is to pass upon the constitutionality of legislation that has been enacted and that is challenged. This is the sole task for judges. We should not allow our personal preferences as to the wisdom of legislative and congressional action, or our distaste for such action, to guide our judicial decision in cases such as these. The temptations to cross that policy line are very great. In fact, as today's decision reveals, they are almost irresistible.
Id. at 410-11, 92 S.Ct. at 2814-15.
POWELL, J., DISSENTING:
* * * * * *
"When the power of Congress to pass a statute is challenged, the function of this Court is to determine whether legislative action lies clearly outside the constitutional grant of power to which it has been, or may fairly be, referred. In making this determination, the Court sits in judgment on the action of a co-ordinate branch of the Government while keeping unto itself  as it must under our constitutional system  the final determination of its own power to act... .

*462 "Rigorous observance of the difference between limits of power and wise exercise of power  between questions of authority and questions of prudence  requires the most alert appreciation of this decisive but subtle relationship of two concepts that too easily coalesce. No less does it require a disciplined will to adhere to the difference. It is not easy to stand aloof and allow want of wisdom to prevail, to disregard one's own strongly held view of what is wise in the conduct of affairs. But it is not the business of this Court to pronounce policy. It must observe a fastidious regard for limitations on its own power, and this precludes the Court's giving effect to its own notions of what is wise or politic. That self-restraint is of the essence in the observance of the judicial oath, for the Constitution has not authorized the judges to sit in judgment on the wisdom of what Congress and the Executive Branch do." 356 U.S., at 119-120, [78 S.Ct. at 607-08, 2 L.Ed.2d at 652-53].
408 U.S. at 432-33, 92 S.Ct. at 2825.
REHNQUIST, J., DISSENTING
* * * * * *
The very nature of judicial review, ..., makes the courts the least subject to Madisonian check in the event that they shall, for the best of motives, expand judicial authority beyond the limits contemplated by the Framers. It is for this reason that judicial self-restraint is surely an implied, if not an expressed, condition of the grant of authority of judicial review.
Id. at 470, 92 S.Ct. at 2844.
NOTES
[1] Whether Sammy Hampton in fact told Agent Shanks that Hill was involved in the American Freight Lines robbery was not corroborated. Hampton was not involved in any way in the hijacking of the American Freight Lines truck, or robbery and murder of Watkins. He and Hill both pleaded guilty to the robbery of the meat packing company truck and driver, and were sentenced to the penitentiary by the Circuit Court of Tunica County. Hill was sentenced on September 6, 1979, to a term of 20 years.

Hill admitted saying, "Sammy will get his," but said he was referring to the Tunica County hijacking. He also testified the response was to a statement by Agent Shanks that Sammy was "trying to make it easy on hisself and why don't you make it easy on yourself, and I just stated Sammy would get his. That's what I said." (R. 780).
In any event, the record discloses no other benefit derived from Shanks' questioning of Hill these three days than this one statement; no confession or incriminating admission was made.
The significance of Hampton's non-involvement in the American Freight Lines hijacking, and the robbery and murder of Watkins, will be borne out further in this opinion. It is also clear from the testimony of Agent Shanks that during the questioning of Hill in July, 1979, the authorities did not know Watkins had in fact been killed. They only knew he had disappeared.
Hampton did not testify in this case, and was not listed as a prospective witness for the state in any pretrial discovery proceedings.
[2] It would appear from the record that Hill's attorneys were unaware Hill had again been questioned by Ward on Saturday night following the confession, when he relented and told Ward the truth about the gun. This last conversation was never mentioned by Hill or Ward in the hearing on the pre-trial motion to suppress the confession. The first mention in the record of this conversation was Hill's testimony in chambers when defense counsel objected to the introduction of the gun into evidence. (R. 931).
[3] The beginning of this exclusionary rule in the United States courts is found in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), which held that articles obtained as a result of a warrantless search were inadmissible in evidence. This case changed the common law rule that all competent evidence, notwithstanding its unlawful acquisition, was admissible. Beginning with Tucker v. State, 128 Miss. 211, 90 So. 845 (1922), this Court adopted the same exclusionary rule, predicated at the time, however, upon Article 23 of the Mississippi Constitution.
[4] Some state courts and other federal circuit courts have engrafted another exception to the "fruit of the poisonous tree" doctrine: inevitable discovery. This exception would also allow introduction of indirect evidence if it were shown that such evidence inevitably would have been discovered from an independent source. The Court of Appeals of the 5th Circuit has rejected such exception, however. See United States v. Houltin, 525 F.2d 943 (5th Cir.1976).
[5] Further in this opinion we will discuss the prosecution's statement to the jury that their verdict was not the "last word", an argument we do not condone. Ruefully, we are constrained to use this language and remind the state that with all the post-conviction proceedings available to an accused in both our state and federal courts, this opinion may not be the last word on the above assignment of error.
[6] If counsel had thought the psychologist's evaluation of some benefit, it would have been relevant and proper to have him testify on the sentencing phase. See Miss. Code Ann. § 99-19-101(6)(b), (f) (Supp. 1981).
[7] The schizophrenic testing, according to the psychologist, indicated a "possible problem". (R. 1254).
[1] Nothing said by the majority suggests any overruling of the cases cited in this section, and we are confident no one would suggest that the majority opinion has any such effect. Whenever one of this Court's decisions effects a major change in established precedent, the prior precedent is expressly overruled and the overruled cases are set forth in the opinion. See, e.g., McDaniel v. State, 356 So.2d 1151, 1161 (Miss. 1978) (overruled cases allowing jury instruction stating that voluntary intoxication could be a defense to certain crimes); Davis v. Waterman, 420 So.2d 1063, 1067 (Miss. 1982) (changed standard of care minors are held to when operating motor vehicles); Pruett v. City of Rosedale, 421 So.2d 1046, 1052-53 (Miss. 1982) (abolished doctrine of sovereign immunity); Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454 (Miss. 1983) (abolished rule disallowing punitive damages in Chancery Courts). I trust nothing said by the majority in any way questions the correctness of this approach.
[2] This Court has previously recognized this trial strategy exception and applied it in death penalty cases, albeit under the mistaken notion of a procedural bar rule. See e.g., Myers v. State, 268 So.2d 353, 356 (Miss. 1972); Jones v. State, 381 So.2d 983, 990-91 (Miss. 1980); Smith v. State, 419 So.2d 563, 566 (Miss. 1982). Moreover, the majority opinion in this case applies this rationale, see, supra, 432 So.2d at 439.
[1] Since our capital murder statutes subsequent to 1972 were enacted solely in an attempt to comply with United States Supreme Court decisions, I think we may safely restrict our inquiry to pronouncements of that Court.
[2] The evolution from mandatory death sentences to jury discretion is also set forth in Furman v. Georgia, 408 U.S. 238 at 339-41, 92 S.Ct. 2726 at 2777-78, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring); Woodson v. North Carolina, 428 U.S. 280 at 289-93, 96 S.Ct. 2978 at 2984-86, 49 L.Ed.2d 944 (1976) and Roberts v. Louisiana, 428 U.S. 325 at 332-33, 96 S.Ct. 3001 at 3005-06, 49 L.Ed.2d 974 (1976).
[3] Furman consisted of three appeals: two petitioners from Georgia, and one from Texas. Two of the petitioners had received death sentences for rape, and one for murder.
[4] The same argument against unbridled jury discretion, which was rejected as a due process violation in McGautha, bore fruit in Furman as a violation of the Eighth Amendment. As stated by Justice Douglas: "Indeed the seeds of the present cases are in McGautha." 408 U.S. at 248, 92 S.Ct. at 2731. In this 233 page opinion in the U.S. Reports, all nine justices saw fit to write separately.
[5] See Roberts v. Louisiana, supra, 428 U.S. at 352-53, 96 S.Ct. at 3014-15 (Burger, C.J., dissenting); Note, Discretion and the Constitutionality of the New Death Penalty Statutes, 87 Harv.L.Rev. 1690 (1974). Mississippi promptly addressed the question. 1974 Miss. Laws ch. 576, amending Miss. Code Ann. §§ 97-3-19 to -21 (1972). We interpreted these statutes in Jackson v. State, 337 So.2d 1242 (Miss. 1976). The Legislature thereafter amended § 97-3-21 and enacted procedural rules to comply with Jackson. 1977 Miss. Laws ch. 458, amending Miss. Code Ann. § 97-3-21 (1972) to what is now Miss. Code Ann. §§ 97-3-21 and 99-19-101 to -105 (Supp. 1982).
[6] The first, second, and last excerpts are within the judgment of the Court as announced by Justice Stewart. The third quote is found in Justice White's concurring opinion.
[7] The statutes are somewhat ambiguous on "sufficient aggravating circumstances." Section 99-19-101(3)(a) uses the term in the plural, but section 99-19-103 only requires a single aggravating circumstance to justify the death penalty.
[8] Section 99-19-101(5)(h) does suggest one possible additional ingredient as an aggravating circumstance beyond the capital murder statute: the capital offense was especially heinous, atrocious or cruel.